UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  11-20209-CR-SEITZ

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

BARRY MINKOW,

      Defendant,

--------------------------------------/

**DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT
AND REQUEST FOR ALTERNATIVE SENTENCE**

      The defendant, Barry Minkow,  by and through his undersigned counsel, and pursuant to

U.S.S.G. § 6A1.2-3, p.s., Fed. R. Crim. P. 32 (d), (e)(2) and (f), and the Fifth Amendment to the

United States Constitution, respectfully registers his Objections to the Presentence Investigation

Report (PSR) and Request for Alternative Sentence and as grounds therefore, states as follows:

**I.  INTRODUCTION:**

      Pursuant to *U.S. v. Booker*, 543 U.S. 220 (2005), the federal sentencing process has adopted

a three step approach. (See Fed. R. Crim. P. 11(M), amended December 1, 2007,  *U.S. v. Pugh*, 515

F. 3d 1179 (11th Cir. 2008) and, most recently, Amendment 741 of the Sentencing Guidelines,

effective November 1, 2010.)   First, the Court is to resolve any disputed guideline issues and

determine the advisory guideline range.  To that end, the written plea agreement between the parties

in this case calls for a base offense level 6, due to the maximum five-year statutory penalty

applicable to the count of conviction, that a reasonable estimate of the foreseeable pecuniary  harm

that resulted from the offense was greater than $400,000,000, increasing the offense level by 30, a 2-level enhancement for sophisticated means, a 2-level enhancement for abuse of trust, and a 3-level reduction because of Mr. Minkow's complete and timely acceptance of responsibility. Notwithstanding these agreements, pursuant to § 5G1.1(a), the *advisory* guideline sentence is no more than 60 months.

Second, the Court is to consider if there are any factors that may warrant a departure from the *advisory* guideline range. Although the PSR correctly states that Mr. Minkow has agreed to provide substantial assistance to the government which may result in the filing of a § 5K1.1 and/or Rule 35 motion, it fails to identify any additional factors that may warrant a downward departure in this case. Mr. Minkow will offer several additional factors for this Court to consider.

Lastly, the Court is to consider all of the sentencing factors of 18 USC § 3553(a) and impose a sentence which is "reasonable" and not greater than necessary to achieve the sentencing objectives set forth in 18 USC § 3553(a). Mr. Minkow offers compelling evidence for this Court to consider a sentence below the *advisory* guideline range.

## II.  OBJECTIONS/CLARIFICATIONS TO PSR ( NON-GUIDELINE ISSUES):

**1.** As to the Victim Impact section of the PSR (**paragraphs 24 through 31), paragraph 106**, and the statutory maximum fine appearing on **page two** of the PSR, Mr. Minkow objects to the restitution amount of $583,573,600 owed to Lennar. Pursuant to the written plea agreement (see footnote 1, page 5), "defense counsel is expressly authorized to argue that all or a portion of this loss was mitigated after disclosure of the offense conduct for the purposes of determining the appropriate restitution amount."

Attorney Daniel Petrocelli, on behalf of Lennar, has explained in several paragraphs contained in the PSR how Lennar is reportedly owed more than $500 million in restitution. In the concluding paragraph of the Victim Impact section (paragraph 30), Mr. Petrocelli stated that Lennar's stock declined more than $825 million in January and February 2009 and that, taking a conservative approach, the damage caused to Lennar was $583,573,600. "Mr. Petrocelli stated Lennar seeks restitution in that amount."

Mr. Minkow's position is that Lennar only lost money if it had made a public offering of its stock at the time of Minkow and Marsch's statements and sold at artificially low prices caused by their fraud. Mr. Minkow further argues the victims of this offense were the stockholders of Lennar, not Lennar itself, and they were only victims if they had sold their positions in Lennar at a time Minkow and Marsch had caused the stock to drop, and not after it had recovered once the fraud became public. In other words, restitution in this case must be limited to the taxable events caused by the fraud, actual transactions with actual losses, and not paper losses temporarily carried on a public corporation's balance sheet until the truth of the fraud had reached the public. Further, it is the burden of the government to identify the shareholders who had sold their Lennar stock, when it was sold, how much it was sold for, and notwithstanding the fraud, what it should have sold for. Finally, restitution, pursuant to the Mandatory Victims Restitution Act, must be determined by that process and, pursuant to 18 USC § 3663A(c)(3)(B), restitution in this case may not apply if "determining complex issues of fact related to the cause, or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." Additionally Minkow would note that he has agreed to a judgment in the Florida State case pending before the Honorable Gil Freeman

in the amount suggested by Lennar and Probation. While Minkow has agreed to be bound by this non

discharge able sum, it is still an inappropriate amount for mandatory restitution. Finally, it would be

redundant to effectively create a second civil judgment against Minkow in the form of mandatory

restitution inuring to the same victim (Lennar) which will be the case as there is absolutely no way

the suggested amount could be paid through any period of supervised release.

2.   As to **paragraph 47** of the PSR, and whether the 25 year sentence was eventually

reduced, notwithstanding the probation officer's statement, "no court or probation record was found

to corroborate this," evidence within this same paragraph points to the contrary.   This same

paragraph reports  Mr. Minkow was incarcerated in 1988, he received a 25 year sentence on March

27, 1989, and it  was terminated on August 2, 2000, not January 12, 2013, had the 25 year sentence

not been reduced.   Further,  Mr. Minkow never asserted his 1989 sentence was reduced to 87

months, only that he served 87 months under the pre-sentencing guideline provisions of 18 USC §

4205.   The PSR also devotes  a page and a half in paragraph 47 re-telling the government's version

of the 1989 conviction.   However, it must be noted that where it explains that ZZZZ Best was

experiencing cash flow problems during 1983 and 1984, Mr. Minkow was then 17 and 18 years old,

and he did not graduate high school until June 1984.  Where the PSR states that ZZZZ Best became

publicly traded in or about 1986, Mr. Minkow had yet to turn 21 years old.   Mr. Minkow asks that

these changes be made to the PSR.

3.   As to **paragraph 55** of the PSR, Mr. Minkow objects to almost an entire  page of the PSR

again re-telling  the  government's version  of the  ZZZZ Best  fraud.   Paragraph 55 of the PSR is

contained in the Personal and Family Data section of the PSR, not the Criminal History section of

the PSR.  Mr. Minkow asks that the government's version of  the ZZZZ Best case  be deleted from

the Personal and Family Data section of the PSR and, specifically, from paragraph 55.

**4.** As to the Mental and Emotional section **(paragraphs 68 and 69)** and the Substance Abuse section **(paragraphs 70 to 72 )** of the PSR, Mr. Minkow asks that these sections be revised to include the professional evaluation of Dr. Michael Brannon, dated May 10, 2011.  Included in Dr. Brannon's evaluation of Mr. Minkow is a diagnosis that includes  Attention-Deficit/Hyperactivity Disorder, Anxiety Disorder NOS, Opioid Dependence Disorder, Anabolic Steroid Abuse, Personality Disorder NOS (antisocial and narcissistic features), and  Severe Migraine Headaches. Dr. Brannon's conclusion is that , "clinically, he would possibly benefit from weekly individual cognitive-behavioral sessions, the prescription and monitoring of psychotropic medication for symptoms of anxiety and ADHD, and participation in substance recovery meetings several times a week.  It should be noted that the defendant also requires ongoing medical care for his chronic and severe migraine headaches.  He also should be strongly encouraged to distance himself from positions of authority, control, and persuasion of others including voluntary positions in business and the clergy." If incarcerated, Mr. Minkow will ask this Court to recommend to the Bureau of Prisons that it consider him a candidate for its 500 hour Substance Abuse Program (RDAP).

### III.  OBJECTIONS TO PSR  (GUIDELINE ISSUES):

**1.** Pursuant to the written plea agreement, Mr. Minkow accepts the guideline calculations presented in the PSR and the *advisory* guideline sentence of 60 months.

**2.** Mr Minkow  objects to **paragraph 109**  of the PSR.   Although it correctly states Mr. Minkow will provide substantial assistance to the government, which may result in a § 5K1.1 and/or Rule 35 motion, the paragraph fails  to identify any additional factors  that may warrant a departure

from the *advisory* guideline sentence in this case.  Mr. Minkow respectfully requests this Court consider downward departures, pursuant to §§ 5H1.4 and 5K2.0.  As before *U.S. v. Booker,* 543 U.S. 220 (2005), the court is to depart when it is warranted under the facts and circumstances of a particular case. "The application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered," *U.S. v. Jordi,* 418 F. 3d 1212, 1215 (11th Cir. 2005).

The standard for considering a departure under this section is § 5K2.0(a)(1)(A). The sentencing court may depart from the applicable guideline range if there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 USC § 3553(a)(2), should result in a sentence different from that described.

Further, pursuant to § 5K2.0 c), the court may depart from the applicable guideline range based on a combination of two or more offender characteristics, none of which independently is sufficient to provide the basis for departure, only if (1) such offender characteristics or other circumstances are (A) present to a substantial degree; and (B) is identified in the guidelines as a permissible ground for departure.  To that end, Mr. Minkow suggests the *advisory* guideline sentence fails to consider both his health history and current health needs, § 5H1.4, as well as the failure to award him the full three-level reduction for his complete and timely acceptance of responsibility (see § 3E1.1 and paragraph eight of the written plea agreement) due to the unique guideline application which is clearly beyond the heartland of cases, § 5K2.0.  These are not factors for downward departure prohibited by the sentencing guidelines, § 5K2.0(d), and in fact, downward departures under §§ 5H1.4 and 5K2.0 are available for this Court's consideration in the Statement of Reasons form, AO 245B, in Section V, "Departures Authorized By the Advisory Sentencing Guidelines."

6

    <u>Mr. Minkow  suffers from a variety of  serious health conditions which may be exacerbated by a term of imprisonment and  will certainly challenge the medical services offered by the Bureau of Prisons.</u>  Pursuant to the most recent amendment (739, effective November 1, 2010) to § 5H1.4, physical condition, individually, or  in combination with other offender characteristics, **may** be a reason  for a downward  departure. The significant change here is "may," from "not ordinarily relevant."  Indeed, the Commission recognized that district courts had departed downward in 196 cases specific to § 5H1.4 and in another 409 cases for variances specific to physical condition in the previous fiscal year.[1]

    Mr. Minkow does not suggest he has a life-threatening disease, only that he has a long history of serious problems and a present variety of serious  health conditions  which require a litany of prescribed medications to control.  He further suggests  these conditions will tax the medical services of the Bureau of Prisons and his incarceration will exacerbate many of these  problems.  Indeed, the probation officer has reported Mr. Minkow's physical, mental and substance abuse history and current problems in three full pages (18 through 21) of the PSR.

    Mr. Minkow was diagnosed with ADHD before the first grade and he was prescribed Ritalin from age 6, until age 15, when in the 9th grade, he was able to redirect some his energy to weightlifting.  (He discontinued any prescribed medication for ADD until 2002, when his wife recognized the condition.  Mr. Minkow has since been prescribed a generic of Adderall, which he now takes twice daily.)  However, his weightlifting was accompanied by chronic steroid abuse, which lasted for years.  As a result, he underwent male breast reduction surgery in 2004, he was diagnosed with testicular atrophy in 2005, and he can no longer produce sperm or testosterone.  Paragraph 64

---

[1]  USSC 2009 Sourcebook of Federal Sentencing Statistics, Tables 25, 25A and 25B

of the PSR lists the many prescribed medications he must take to treat this condition.

According to Dr. Andrew Blumenfeld, a California neurologist, the severity of Mr. Minkow's migraine headaches rank in the top 5% of hundreds of patients the doctor sees. Mr. Minkow has already failed to respond to Migranal, Elavil, Paxil, Wellbutrin and Prozac. According to paragraph 65 of the PSR, "On several occasions since 2005, Minkow's headaches were so severe that he had to administer Marcaine nerve block injections to alleviate the pain." Mr. Minkow must now rely on Toradol injections, Maxalt and Indocin for relief and it is not known if Toradol is on the BOP's approved medications list. "Finally, Dr. Blumenfeld stated Minkow needs continuous treatment for his lifelong battle with migraine headaches and needs the previously mentioned, widely recognized and accepted migraine medicine treatments."

Dr. Rothenberg of the California Healthspan Institute has diagnosed Mr. Minkow with high cholesterol, kidney stones, migraine headaches, ADD, and an inability to produce an adequate amount of hormones. Paragraph 66 of the PSR lists 10 different prescription medications, including an injection, for these conditions, not including the three prescribed by Dr. Blumenfeld.

Dr. John Milligan of Crossville, Tennessee is Mr. Minkow's current physician. He has adopted and corroborated earlier medical reports and has prescribed anti-estrogen medication because "while Mr. Minkow's body does not produce testosterone, it does produce excess amounts of estrogen which in high levels is dangerous for him."

In an August 21, 2006 memorandum to all district court judges, the Administrative Office of the U.S. Courts indicated that the Bureau of Prisons will consider the presentence investigation report, the statement of reasons and judicial placement recommendations in assigning a CARE level to an inmate. There are four levels in the BOP CARE level system, which classifies inmates according to

their healthcare needs.  Mr. Minkow should  be precluded from Level 1 and, while it is not known exactly what Care level he will be assigned, any considerable prison sentence might  very well tax the Bureau of Prisons' medical services and exacerbate Mr. Minkow's various health conditions, especially if the proper medications are not available to him.

The PSR suggests an *advisory* guideline sentence of 60  months.  And although this Court is certainly aware the sentencing guidelines are no longer mandatory, even when they were mandatory, downward departures under § 5H1.4 were permissible for extraordinary reasons.  Courts have affirmed downward departures where the defendant suffered from Crohn's Disease, *United States v. Martin,* 363 F. 3d 24 (1st Cir. 2004), where a defendant had a serious heart condition and related problems, *United States v. McFarlin,* 535 F. 3d 808 (8th Cir. 2008), where the defendant suffered  the debilitating effects of cancer, *United States v. Ghannam,* 899 F. 2d 327 (4th Cir. 1990), and heart disease, *United States v. Gee,* 226 F. 3d 885 (7th Cir. 2000).  Further, under 18 USC § 3553(a)(2)(D), specifically, district court's must consider the medical care  of a defendant when imposing sentence. Just as these conditions tax the resources and finances of the Bureau of Prisons and place an added risk to an inmate, Mr. Minkow  believes that any period of incarceration may exacerbate his present health conditions.

Mr. Minkow asks this Court to consider a downward departure because he has not  received the expected benefit for his acceptance of responsibility.

The parties in this case have agreed  Mr. Minkow is entitled to a three-level reduction for his complete and timely acceptance of responsibility in this case (see plea agreement, paragraph 8). However, since the three-level adjustment (§ 3E1.1) is made before the application of § 5G1.1(a) (see § 1B1.1, application of the guidelines must be made in order of the Guidelines Manual, i.e., Chapter

Three adjustments are made before Chapter Five adjustments), Mr. Minkow has not received the customary reduction to his *advisory* guideline range.  As such, Mr. Minkow believes that, pursuant to § 5K2.0, the sentencing guidelines, as applied in his case, represent a circumstance of a kind, or to a degree, not adequately considered by the Commission in formulating the guidelines.  Indeed, in *United States v. Rodriguez*, 64 F. 3d 638, the Eleventh Circuit in 1995 recognized this same situation was outside the "heartland" of cases and granted the district court discretion in awarding   a three-level downward departure when the statutory maximum sentence did not allow for the normal three-level adjustment under § 3E1.1.  Mr. Minkow asks this Court for the same consideration.

In summary, Mr. Minkow  prays this Court will find he has met the standards  of §§ 5H1.4 and 5K2.0   and grant him a downward departure. Of course, this Court may also consider Mr. Minkow's  health problems  and the failure to award him the customary three-level reduction for his complete and timely acceptance of responsibility as sentencing factors set forth  under 18 USC § 3553(a)(2)(D),  in determining a "reasonable but not greater than necessary sentence." It should be also noted here that the Government which often requires a Defendant to waive potential relief pursuant to Rodriguez, supra,  specifically declined to do so in this case which suggests this departure is reasonable. Finally, as part of accepting responsibility in this matter Defendant has turned over literally thousands of pages of documents to the Government to fully and completely understand and appreciate the nature and extent of Defendant's violation.

## IV.  SENTENCING SUBMISSION AND REQUEST FOR ALTERNATIVE SENTENCE:

Barry Minkow  has pled guilty to a conspiracy to commit securities  fraud,  in violation of 18 USC § 371.   The parties in this case have reached an agreement (see written plea agreement) and

determined that Mr. Minkow should face an *advisory* guideline sentence of 60 months. The PSR has made the same determination and Mr. Minkow has not objected to the guideline calculations presented in the PSR    However, in addition to Mr. Minkow's substantial assistance to the government and the possible motions under § 5K1.1 and/or Rule 35, Mr. Minkow has asked this Court to consider additional downward departures under §§ 5H1.4 and 5K2.0.   Notwithstanding those  arguments, "the court shall impose a sentence sufficient, but not greater than necessary," to comply with the purposes of 18 USC § 3553(a).  As this Court is aware, district courts are now free from the mandatory nature of the Federal Sentencing Guidelines,  *U.S. v. Booker,* 543 U.S. 220 (2005).  Subsequent to *Booker,  Gall v. United States,* 128 S. Ct. 586, and *Kimbrough v. United States,* 128 S. Ct. 558, both decided on December 10, 2007, and *U.S. v. McBride*, 511 F. 3D 1293 (11TH Cir. 2007),  made clear  that district courts are only required to give "some weight" to the advisory guidelines, as they are to the other 18 USC § 3553 factors, and any attempt to give special weight to the sentencing guidelines is contrary to *Booker*.   However, the Supreme Court has since gone further in its recent decision in *Nelson v. United States,* 129 S. Ct. 890 (2009), where the court reiterated what it said in *Rita v. United States,* 551 U.S. 338 (2007), that a sentencing court may not presume that a sentence within the applicable guideline range is reasonable but added "the Guidelines are not only *not mandatory* on sentencing courts, they are also not to be *presumed reasonable."*  To that end, Mr. Minkow offers the following:


**Mr. Minkow's  Personal History:** Barry Minkow is a 45 year old native of California,  now living 70 miles outside of Knoxville, Tennessee.  He is the son of Robert and Carole Minkow, the brother of Gail Ortiz and Sheri Werner, the husband of Lisa for the past nine years, and the father of

eight year old twins, Robert and Dylan.

Mr. Minkow was raised in Reseda, a low to middle income suburb of Los Angeles, and he lived in the same modest, three bedroom, 1,500 square foot home, until he was 18 years old.  His father had brain surgery in his forties and after suffering several strokes, he finally died at the age of 65, in July 1996.  He had struggled his entire life to make a living as a commercial real estate agent, and  Mr. Minkow will tell this Court they were the only Jewish family in town, and the poorest.  Even with  continued financial assistance from grandparents, Mr. Minkow remembers the power being turned off in the house on many occasions.  He also remembers them as a "Two Dart Family," a white and a green Plymouth automobile, both old and both in disrepair.

Mr. Minkow was diagnosed with severe Attention Deficit Disorder as a youngster and, admittedly, he was a handful for the public schools.  His grandmother found the money for him to attend military school in the seventh and eighth grades, but the school then closed and there was no money left.  At about that time, Mr. Minkow's mother was employed in telephone sales for a carpet cleaning company and, at age 12, Mr. Minkow went to work with his mother to earn some extra money. By age 15, he was cleaning carpets and learning the business.  By the age of 16 (October 1982), while still  in the eleventh grade, he started his own company, ZZZZ Best, a carpet, furniture and drapery cleaning business from his garage.  By his senior year of high school, while his fellow high school students were solving algebra problems, Mr. Minkow was worried about making payroll. ZZZZ Best quickly  grew to a business with 23 locations and 1,400 employees.  By the age of 20, Mr. Minkow raised $17 million and took his company public. He was then just shy of the legal drinking age in California.  And he will tell this Court, even today, he was motivated by no longer wanting to be the  poorest family in Reseda.

The publicity surrounding 20 year old Minkow and his public company was astounding. There were appearances on major television news/talk shows and features in the major print media. However, just as astounding and with as much publicity was the discovery that a major segment of ZZZZ Best was a fraud, and that Mr. Minkow had allowed himself to be compromised by organized crime. He was arrested on January 14, 1988, at the age of 21, and held without bond.  On March 27, 1989,  Mr. Minkow was sentenced in federal court to 25 years under the forerunner of the sentencing guidelines, 18 USC § 4205.  He had just turned 23 years old earlier that month.

**Federal Prison at Age 23**: Mr. Minkow served most of his sentence at the low-security federal correctional facility at Englewood, located 15 miles southwest of Denver,  Colorado,  and more than a thousand miles (15 ½ hours driving distance from his mother and father.  During that time, he was very much influenced by his cell mate and undertook a conversion to Christianity. On May 9, 1992, he was awarded  his undergraduate degree in church ministry education from Liberty University, with a 3.083 grade point average,  and the following year, he completed his graduate degree in arts and religion.  His institutional record was spotless; not one disciplinary action.  He was released to a Los Angeles halfway house in December 1994 and completed the 25 year prison sentence in April 1995.  Barry Minkow had just turned 29 years old.

**Life after Prison; Religion and Assistance to the United States:** Mr. Minkow lived in Los Angeles until March 1997.  During those years, he earned another graduate degree in divinity (January 27, 1997, with a 3.051 grade point average), which included a 90 semester hour program and residency.  He first  found work as director of the bible institute, under the direction of Dr. David Miller,  at the Church of Rocky Peak in Chatsworth, California.  In March 1997, he moved to San Diego to become pastor of the Community Bible Church, which at the time, had 130 members and

one weekend service.  When he resigned on March 15, 2011, anticipating his guilty plea in the case before this Court, the church had 1,400 members and conducted six services each weekend.

In April 1995, two weeks after his release from a Los Angeles halfway house, Mr. Minkow, at the invitation of the FBI and with the permission of his federal probation officer,  was in Quantico, Virginia teaching fraud prevention to new FBI recruits.  On July 27, 1995, he spoke at the FBI Financial Institution Fraud Seminar.[1]   He returned to the FBI Academy between June 17 and June 21, 1996, where he gave two presentations on "Z Best, A Study in Fraud," and "Ethics in Business, the Motive Behind the Con."[2]   On September 25, 1996, Mr. Minkow addressed the Financial Institution Fraud Conference in Breckenridge, Colorado.[3]    From  1995 until 1996, he taught fraud detection at over 40 CPA societies and traveled throughout the country with CPA Gary Zeune, again, with the permission of the federal court in California.  From 1997 until 2002, Mr. Minkow continued to speak before FBI agents, Pentagon officials, CPA societies and state attorney generals.  In April 1998, he presented a program entitled, "Compromise, Corruption, Collapse and Comeback," before the Worldwide Army Internal Review Training Symposium.[4]

In July 2001, Mr. Minkow co-founded Fraud Discovery Institute, as an organization to teach

---

[1]  See August 4, 1995 letter by Supervisory Special Agent David Nesbitt, FBI, attached hereto and incorporated by reference herein as Exhibit "A".

[2]  See April 15, 1996 invitation by George B. Clow III, Assistant Director, FBI Academy, and September 9, 1996 letter of appreciation by Supervisory Special Agent Gary J. Kruchten, FBI,  attached hereto and incorporated by reference herein as Exhibit "B".

[3]  See October 8, 1996 letter by Supervisory Special Agent Keith Sloter, FBI,  attached hereto and incorporated by reference herein as Exhibit "C".

[4]  See April 17, 1998 letter by Karen Wolff, Director, Financial Reporting and Internal Review,  attached hereto and incorporated by reference herein as Exhibit "D".

and train all kinds of professionals how to uncover fraud.  He provided a program to First Pacific Bank of California in September 2002[5], to City National Bank in La Jolla, California on January 2003[6], to C and S Companies in Syracuse, New York in April 2003[7], and once again to the FBI in March 2004.[8]

On July 22, 2002, James R. Asperger, who prosecuted Mr. Minkow in the ZZZZ Best case in California,   wrote to the sentencing judge, Judge Tevrizian, in support of Mr. Minkow's request that his probation be terminated.[9]   Mr. Asperger had met and spoken to Mr. Minkow on many occasions since his release, he had heard him speak at the Church of Rocky Peak in Malibu, and he was aware Mr. Minkow had spoken to many professional groups about the detection of fraud. Further, he wrote that  "Mr. Minkow also spoke recently to a group of over 30 associates and summer associates at my law firm on the psychology of fraud and related issues.  His presentation was extraordinarily well-received, and those who attended considered him to be impressive, engaging and insightful."  And despite the international publicity that surrounded the ZZZZ Best prosecution, and despite the persona of Barry Minkow as portrayed by the media, Mr. Minkow's probation was terminated early by the Court on August 27, 2002.   In fact, years later, **even Judge Tevrizian,**

---

[5]  See September 30, 2002 letter by A. Vincent Siciliano, President and CEO,  attached hereto and incorporated by reference herein as Exhibit "E".

[6]  See January 21, 2003 letter from Bernadette Bach, SVP,  attached hereto and incorporated by reference herein as Exhibit "F".

[7]  See April 30, 2003 letter from Orrin MacMurray, President and CEO,  attached hereto and incorporated by reference herein as Exhibit "G".

[8]  See March 8, 2004 letter from Brian Lamkin, Section Chief, Financial Crimes Section, FBI,  attached hereto and incorporated by reference herein as Exhibit "H".

[9]  See letter from former federal prosecutor James Asperger of O'Melveny and Myers, attached hereto and incorporated by reference herein as Exhibit "I".

speaking on CBS' "60 Minutes" on May 19, 2005, stated "he's uncovered several hundreds of millions of dollars' worth of frauds. And I have to give him credit for that."[10]  Mr. Minkow will now tell this Court that his commitment to religion and to his community, once he was released from prison, was his way of seeking his own redemption and giving something back.....a debt he owed his community and those who loved him.

**Fraud Discovery Institute and Mr. Minkow's eventual involvement with Nicolas Marsch:** Barry Minkow co-founded Fraud Discovery Institute (FDI) in July 2001 to teach and train government and non-government professionals to uncover fraud. By March 2003, FDI began to move from teaching how to uncover fraud to actually uncovering fraud. (FDI had already assisted the SEC in winning a roughly $900,000 default judgement against California businessman Edward Showalter in 2001. In Court filings, the SEC noted that Mr. Minkow had provided new evidence, including voice mails from Showalter and a packet of information for a new business he was pitching to investors.[11]

On October 24, 2005, Mr. Minkow and FDI received a Commendation Letter from Peter H, Norell, Acting Assistant Special Agent in Change, FBI, confirming "your work in assisting the Federal Bureau of Investigation and other law enforcement agencies identify and help disrupt and dismantle various financial frauds totaling millions of dollars. These frauds involved both ongoing operations and historical cases with many potential and actual victims. **In most cases, law enforcement knew little or nothing about these matters before your involvement.** The

---

[10]  See www.cbsnews.com/stories/2005/05/19/60minutes/main696669.shtml, attached hereto and incorporated by reference herein as Exhibit "J".

[11]  Wall Street Journal, "A Shot at Redemption: White Collar Crook Now Helps Authorities Uncover Scams," by Jeff D. Opdyke.

Commendation letter identifies seven "detailed written reports" submitted by Mr. Minkow which led to criminal filings in several FBI field offices, including Turning International/Derek Turner[12] and Rainmaker/Alrezha Dimaghani[13] (New York Field Office), Financial Advisory Consultants/James Lewis[14], MX Factors/Randy Harding[15] and Par Three Financial [16] (Los Angeles Field Office), Ware Enterprises/Warren Ware[17] (Miami Field Office) and Chicago Development and Planning/Pat Morgan[18] (San Francisco Field Office). "Moreover, our records indicate that there are also six (6) additional current investigations that we have opened based upon information received from you.".....

**"This accomplishment is worthy of commendation in that you identified millions of dollars of fraud and prevented further potential economic loss to hundreds of victims. The FBI appreciates your cooperation in these matters and encourages you to continue making us aware of crimes that materially affect the integrity of the financial markets of the United States and the confidence of the investing public."**

All told, Mr. Minkow can confidently tell this Court that between June 2003 and December 2008, all before Nicolas Marsch sought him out in January 2009, he and FDI had uncovered approximately 22 frauds, totaling over $1.4 billion, and impacting over 300,000 people. Of further

---

[12] "The Million Dollar Con Man," made for television movie

[13] New York Post, August 28, 2005, "Rainmaker Shoots Off a Vengeful Email

[14] Associated Press, December 11, 2003, by Don Thompson

[15] Wall Street Journal, September 11, 2007, by Keith J. Winstein

[16] Las Vegas Sun, October 14, 2005, by Steve Kanigher

[17] "NFL Warns Players About Florida Investment Program," Dow Jones News Wire

[18] Associated Press, May 4, 2004, by Gary Gentile

evidence is lead counsel Richard Ackerman's July 24, 2007 letter[19] to Mr. Minkow regarding his representation of Pacific Wealth Management investors, "which is a fraud of approximately 100 million in losses and hundreds of victims." In his letter, Mr. Ackerman noted "three specific incidents where your proactive investigative help proved especially beneficial in the formalizing of law enforcement's involvement in this case."

Mr. Minkow, admittedly, made mistakes along the way. In March 2007, he and FDI began making money uncovering frauds by shorting the public companies they targeted. The first case was Usana, in which he and FDI prevailed as defendants in a federal law suit. (Just as they had with Medifast and others.) Then there was Herbalife, Prepaid Legal, Medifast, and Interoil. In many of those cases, Mr. Minkow and FDI uncovered fraud, including gross exaggerations in the resumes of many executives. Mr. Minkow was advised by his Civil attorney in California that his "shorting" of these securities was legal, advise he now questions. He does believe that at best it was unethical and concedes it probably should not have occurred. However, the Court should be aware that this shorting of stocks was at all times fully disclosed in all matter except the one for which he stands convicted before this Court.

In late 2008, Mr. Minkow met with San Diego real estate developer Nicolas Marsch. Marsch had come to Mr. Minkow just as many of his fraud cases had over the years; an individual who was in an economically inferior position to the adversary he faced, claimed he was being cheated and was fighting an uphill battle against a major, and frequently public, company. In two separate law suits, Marsch had accused Lennar of cutting him out of a real estate partnership and separately

---

[19] See July 24, 2007 letter from Richard Ackerman, Ackerman, Cowles and Lindsley, Terncula, California, attached hereto and incorporated by reference herein as Exhibit "K".

misappropriating more than $200 million from a joint venture they had formed to build a high-end residential community in Rancho Sante Fe.  Marsch turned to Mr. Minkow and Mr. Minkow will tell this Court, he failed to due his due diligence and moreover, he crossed the line.  He is guilty of everything the government has told this Court,  and he is profoundly remorseful for his participation in this offense and to anyone who was harmed by his conduct.  He has accepted responsibility for his conduct (see paragraph 16 of the written plea agreement and the factual summary he has adopted as his own statement) and this case has come before this Court for a change of plea in almost record speed.  And Mr. Minkow has continued, since he has done for more than 15 years, to provide substantial assistance to the government, uncovering frauds and saving thousands of actual and potential victims millions of dollars.  Consistent therewith Mr. Minkow has also been cooperating, through Counsel, with his victim in this matter as well.

In *Roberts v. United States*, 445 U.S. 552, 558 (1980), before there were federal sentencing guidelines and before there was *Booker,* the court said that a defendant's cooperation demonstrates that the "defendant will transgress no more [and will] respond to rehabilitative efforts [and] not deem himself at war with his society."

Mr. Minkow  does not face a mandatory minimum sentence in this case and, therefore, the filing of a § 5K1.1 motion is not necessary to reduce his sentence beyond any statutory minimum sentence. (A § 5K1.1 and/or Rule 35 motion is expected pursuant to paragraph 21 of the written plea agreement.)   The Court, under § 5K2.0 or 18 USC § 3553, may apply any weight to Mr. Minkow's cooperation in determining a "reasonable" sentence.  Indeed, this Court may consider  *United States v. Knox*, 573 F. 3d 441 (7th Cir.  2009) (we agree with Davis that, as a general matter, a district court may consider a defendant's cooperation with the government as a basis for a reduced sentence, even

if the government has not made a  § 5K1.1 motion); *United States v. Fernandez*, 443 F. 19, 33 (2nd Cir.  2006) (reasoning that a district court should consider "the contention that a defendant made efforts to cooperate even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1"); *United States v. Doe*, 398 F. 3d 1254, 1260-61 (10th Cir.  2005) (concluding that "a defendant's assistance should be fully considered by the district court at sentencing even if that assistance is not presented to a court in the form of a § 5K1.1 motion"); *United States v, Murray*, 2005 WL 1200185 (S.D.N.Y. May 20, 2005 (unpub.) ("fact that defendant testified as witness for the government at time when he had nothing to gain provides support for his genuine contrition"); *United States v. Hubbard*, 369 F. Supp. 2d 146, 150 (D. Mass.  2005) (suggesting court can correct for government's bad faith not making motion under 3553(a)(2)©; and *United States v. Khoury*, 62 F. 3d 1138 (9th Cir.  1995) (court may depart downward where government refuses to make § 5K1.1 motion because defendant went to trial although government initially offered to do so and where defendant's cooperation led to arrest of co-defendant).  In the case before this Court,  Mr. Minkow  asks that his assistance to the government over the past 15 years, before Nicolas Marsch ever sought him out, separate from his current substantial assistance which is to be the subject of the government's § 5K1.1 and/or Rule 35 motion, and what former federal prosecutor James R. Asperger, Acting Assistant Special Agent in Charge Peter H. Norell, and so many other government officials and business professionals had written about over the years, be fully considered by this Court  in determining a "reasonable" sentence.  We would also point out to the Court that since his plea in this case ( and the Government will confirm this at Sentencing )  Mr. Minkow has already been called to testify in a major prosecution in the United States District Court for the Eastern District of California where he testified for two full days to the complete satisfaction of Assistant United States Attorney

James Lapham.

**Mr. Minkow's Wife and Twin Sons:** Mr. Minkow has been married to Lisa Palmer since February 2002. They have a wonderful marriage and have never been apart.   Lisa was last employed as a sales representative with a cosmetics company, but she had to leave  when she and Mr. Minkow adopted 12 month old twin boys from Guatemala. Robert and Dylan were born on April 6, 2003.  By 2009, they had both been diagnosed with severe ADHD (both are on Ritalin) and dyslexia at Children's Hospital; in San Diego.  However, the diagnosis came as no surprise to Mr. Minkow and his wife.

The Court  has received a developmental evaluation, dated January 13, 2010, on Robert.[20]  As background, the evaluation informs Robert did not speak two-word phrases until he was three years old, three-word phrases until he was four and he was not understandable to strangers until he was five. He did not begin to walk until he was 18 months and, at the time of the 2010 evaluation, he was six years old and in kindergarten.  He had already repeated a second year of pre-kindergarten, struggled in comparison to his peers, had significant difficulty with sound-symbol relationships and was not writing numbers yet.  He was socially engaging, yet he had difficulty paying attention. "The presence of Dyslexia is evident in Robert's current academic skills.  He is unable to read and is having significant difficulty identifying letters.  Robert's spelling and early writing skills are significantly impaired."

This Court has also received the evaluation on Dylan, dated February 24, 2010.[10]  Dylan did not walk alone until he was two years old and he did not put words together until he was 2-1/2 years

---

[20]  By Dr. Spencer R. Wetter, Ph.D.

old.  At the time of this evaluation, he was attending the Cornerstone Christian Montessori School and was in kindergarten with his brother, Robert.  "He is reportedly behind grade level and has demonstrated slow learning in all basic academics, reading, math, spelling, etc.  He was recently evaluated by the Developmental and Behavioral Pediatric Clinic and there are indication of possible dyslexia, as well as visual motor difficulties.  Dylan also shows some difficulties with his behavior. He closes his ears when he hears loud noises and often has other sensory sensitivities, like needing to change his clothes several times a day."  Impressions: "Learning Disorder NOS: Dyslexia and Visual-Spatial Processing Deficits."

Dr. Spencer R. Wetter's evaluations and recommendations regarding the boys are extensive and their  needs have been extremely taxing on both the time and finances of Mr. Minkow and his wife.  The boys are now eight years old, they are underweight and undersized and they are still in the first grade.  Despite private schools and investigating every possible treatment alternative, Robert and Dylan still cannot read.  They are both a handful and Lisa cannot imagine raising the two boys without their father.

**Most Recent Sentencing Statistics:**   The United States Sentencing Commission's Sourcebook of the most recent Federal Sentencing Statistics (Sourcebook)  FYE 2010 provides sentencing  information on 83,946  cases  sentenced by the district courts that year. In the Southern District of Florida, of 2,269 cases, 63.1% (down from 70  % the previous year) received a sentence within the advisory guideline range,   8.6 %  received downward departures under § 5K1.1,  another 21.6 % (more than two and a half times the number under § 5K1.1)  received downward variances under 18 USC § 3553,  and the remaining cases received downward departures for a variety of reasons.

Specific information as to sentences outside the advisory guideline range is only available nationally and is presented in Tables 25, 25A and 25B of the Sourcebook. District courts mostly departed downward due to criminal history issues (42.2 % of all cases) and general mitigating circumstances (11.9 % of all cases) under § 5K2.0, which may include consideration of issues specific to physical condition. However, courts also specifically departed downward in another 104 cases due to health concerns (§ 5H1.4), 183 cases due to family ties and responsibilities (§ 5H1.6), and 33 cases for cooperation without a § 5K1.1 motion, § 5K2.0. As variances under 18 USC § 3553, courts cited the nature and circumstances of the offense or the history and characteristics of the defendant (18 USC § 3553(a)(1)) in 9,198 cases, amounting to 23 % of all downward variances. Courts have also granted downward variances in 465 cases specific to health concerns, 1,312 cases specific to family ties and responsibilities, and 372 cases for cooperation in which no § 5K1.1 motion was filed.

## CONCLUSION

Mr. Minkow is well aware that in fashioning a "reasonable" but not greater than necessary sentence in his case, this Court must consider the nature and circumstances of the offense, 18 USC § 3553(a)(1). To that end, Mr. Minkow has pled guilty to a One Count Information and signed a written plea agreement which contains a factual summary of his conduct. He has accepted responsibility, he is profoundly remorseful, and he is continuing to assist the government, as he has done for much of the past 15 years.

Subsequent to *Booker,* however, this Court must also consider the history and characteristics of the defendant, 18 USC § 3553(a)(1). To that end, Mr. Minkow is certainly aware of all that has been written about his life and that this Court must be aware of much of it. Mr. Minkow was a teenaged high school student when he created ZZZZ Best, he was 20 years old when he took it public

and he was arrested as the perpetrator in a celebrated Ponzi scheme at 21 years of age. (The average age of federal offenders in the Central District of California was 35.8, 65.7 % of all convicted offenders received a prison sentence when the primary offense was fraud, and the average prison sentence for fraud was 21.4 months.)[21] He was released after serving 87 months and he had earned two college degrees and had an incident-free record during that time. For the next 15 years, he was largely praised by the government, the business community and the media for educating those involved in uncovering and/or preventing fraud, and he had been repeatedly recognized by everyone for exposing fraudulent schemes and preventing thousands of victims from losing millions. Along the way, he contributed to the growth of the church he had led for years, he married Lisa and, together, they adopted two twin boys who will always have special needs and require special treatment. And with all that said, Mr. Minkow still suffers from ADHD, he had been addicted to steroids and continues to battle severe medical problems related to that abuse, he has a history of migraine headaches so severe they require injectable medication, and he has an extensive history of substance abuse, including marijuana and cocaine in high school, and an addiction to Vicodin (30 pills daily by 2007) and, eventually, oxycodone, 1,400 milligrams daily by 2009 up to and including December 2010. Mr. Minkow will ask this Court to recommend he be considered a candidate for the Bureau of Prisons' Residential Drug Abuse Treatment Program.[22]

## IV: RECOMMENDATION

Barry Minkow respectfully asks that this Court consider all of his arguments and the factors of 18 USC § 3553(a), and impose a "reasonable" but not greater than necessary sentence. He asks

---

[21] From the earliest USSC Sourcebook available, Fiscal Year 1996

[22] Dr. Michael Brannon's report, dated May 10, 2010, filed separately under seal.

this Court to consider all of his arguments for downward departure, and then consider that his departure arguments are also available to the Court as variances under 18 USC § 3553. Mr. Minkow prays that this Court will fashion a sentence which is both "reasonable" and not greater than necessary, and not take him from his wife and his twin boys any longer than is necessary. Finally, Mr. Minkow asks this Court to recommend to the Bureau of Prisons that he be considered a candidate for their Residential Drug Abuse Treatment Program, as has been recommended by Dr. Michael Brannon, and that he be designated to a facility that offers that program and is as close to his wife and children in Tennessee as possible.

Respectfully submitted,

ENTIN & DELLA FERA, P.A.
110 SE 6th Street
Suite 1970
Fort Lauderdale, Florida 33301
Telephone: (954) 761-7201
Facsimile: (954) 764-2443

By: s/ Alvin E. Entin
ALVIN E. ENTIN
Fla. Bar No. 127027

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 17, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either by transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

_____ s/ Alvin E. Entin _____