UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20209-CR-SEITZ

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

BARRY MINKOW,

    Defendant,

---------------------------------------/

### DEFENDANT'S RESPONSE TO ADDENDUM AND REVISED PSR

COMES NOW the Defendant, Barry Minkow, by and through his undersigned counsel, and pursuant to U.S.S.G. § 6A1.2-3, p.s., Fed. R. Crim. P. 32 (d), (e)(2) and (f), and the Fifth Amendment to the United States Constitution, filed his Objections to the Presentence Investigation Report (PSR) and Request for Alternative Sentence on June 17, 2011. The probation officer subsequently responded with an Addendum to the PSR and a Revised PSR on June 30, 2011, and it is to those that Mr. Minkow now responds.

    1. Mr. Minkow objects to the information provided the probation officer by attorney Damon Forney, which is referred to at the end of the probation officer's Addendum to the PSR, and presented as Supplemental Information. He also objects to the attorney's letter to the probation officer, dated June 28, 2011, in its entirety, for what it alleges, and what it fails to disclose. The letters contains, at best, innuendos and allegations which are either untrue or great exaggerations.

    2. It is important to note that the serious allegations of co-mingling were made to the Government prior to the receipt by Probation of the letter of June 28th. At least two meetings were

held with the Government in this District as well as one in the Eastern District of California in which the majority of the allegations contained in the June 28th letter were discussed. Mr. Minkow candidly responded to the questions posed by Agents and admitted freely to the co-mingling of funds as well as the opening of the credit card accounts, including American Express. Documents provided to this Court, with this filing, as well as other documents including Elder Board meeting minutes dating back nearly a decade were provided to the Government.  The American Express cards, which were opened and used by Barry Minkow, were for Mr. Minkow to use towards Church expenses. Attached hereto, incorporated by reference herein and marked Exhibit "A", are sample American Express breakdown of expenses from March - September 2006 and October 2006-February 21, 2007.

Subsequent to those meetings in this District, the information received from Mr. Minkow was provided to the Assistant United States Attorney in the Eastern District of California, to provide to defense counsel, as Brady material in United States v. Ronald Grove and Donald Mann, Case No. F-07-229-KJM, where Mr. Minkow was scheduled to appear as a witness for the United States. Mr. Minkow, in fact, appeared and was cross-examined on both the facts of the case pending here, as well as the Community Bible Church matters. He fully admitted and accepted responsibility for those matters which he had done, including the co-mingling of funds. Despite the brutal cross-examination, the Defendants in that case were convicted. A copy of the transcript of Mr. Minkow's entire testimony is attached hereto, incorporated by reference herein and marked Exhibit "B".

3.  Mr. Minkow was Community Bible Church's (CBC)  senior pastor for 14 years.  Mr. Forney's letter makes no mention that for many of those years, Mr. Minkow never took a salary.  In fact, Mr. Forney is well aware that the Church had voted Mr. Minkow a salary of $125,000.00 per year which he had refused and has never taken. It also does not mention that Mr. Minkow was such

a charismatic preacher that the Church's congregation grew over the years from 135 to 2,000 and that six weekend services were necessary to accommodate all of its members. Nor did it mention scores of hours each month that Mr. Minkow spent attending to his congregation and dealing with their life cycle events.

     Mr. Forney's letter fails to mention that because of the Church's rapid expansion, its elders had given Mr. Minkow approval "to do whatever was necessary" to meet the Church's growing financial obligations. It fails to mention that Mr. Minkow always had permission to apply and use credit cards and that they were used both to pay the Church's expenses and some of Mr. Minkow's living expenses, in lieu of salary. Yes, it is true Mr. Minkow, at times, had co-mingled the Church's funds with his own and, yes, it is true he was questioned about applying for credit in the names of a few Church members and had, in fact, apologized for any misunderstanding. However, those were matters which were never hidden from the Church, its audit committees, its elders, or its members, and they were long ago addressed and resolved by members of the Church, who had received billing statements at their homes and had known the accounts were entered on their credit reports. Indeed, as late as September 27, 2010, at a CBC Elder Meeting, meeting minutes reflect a Treasurer's Report which identified no audit issues and a Chairman's Report in which it was noted "It is clear that Pastor Barry's giving exceeded what was reimbursed to him." Attorney Forney did not include this in his letter to the probation officer. A copy of the minutes to that meeting is attached hereto, incorporated by reference herein and marked Exhibit "C".

     Mr. Forney's letter talks about the solicitation of funds, forged signatures, and the misappropriation of church donations and church funds. It says Mr. Minkow had victimized the church as early as 2000 and left it crippled in debt. In truth, Mr. Minkow was the principal

3

benefactor of the Church and provided it much of its operating capital out of his own funds. Mr. Forney fails to address just who was paying the Church's expenses during those years and how they were being paid. Obviously, the Church's audit committee would have discovered shortfalls or its members would have complained to Mr. Minkow during his 14 year tenure if they were being hounded by creditors. They were not, as Mr. Minkow was paying the bills. Mr. Forney's letter fails to report the obvious, that during those years and until he resigned from CBC, it was Mr. Minkow who paid the millions of dollars in Church expenses with the funds, donations and accounts he has been accused of stealing from. Indeed, attorney Forney never sought this documentation; however, Mr. Minkow will provide this Court with hundreds of cancelled checks documenting more than $1.6 million in payments toward the Church's expenses in the past few years alone. (Cancelled checks dating to his early years with CBC are not available) And these checks clearly show it was Mr. Minkow who wrote and signed these checks (yes, from co-mingled accounts) to pay the Church's mortgage, credit cards, other pastors, accounting, catering, missionary, employees, utilities, loan payments, etc. Further, between March 2006 and September 2006, $186,085.34 in payments were made to American Express alone and all for the benefit of CBC for expenses related to building design, venues, office equipment/software, special events, janitorial supplies, etc. An additional $38,277 in payments to American Express were made in 2006 and $6,950 was paid in 2007. Yes, Mr. Minkow made some mistakes and yes he co-mingled funds. But there was no fraudulent scheme here and there were never any secrets between Mr. Minkow and the Church's elders. The canceled checks which support the above paragraph are attached hereto, incorporated by reference herein and marked Exhibit "D". Where the checks are not paid directly to CBC, an index/glossary which is attached hereto, incorporated by reference herein and marked Exhibit D-1, establishes who received

the payment and their relation to the Church.

Understandably, Mr. Minkow's resignation from CBC caused a great deal of emotion by all parties. CBC's elders had seen the congregation grow many times over and it was clear Mr. Minkow had been the draw for many years and had put the church on the map. (Indeed, church membership has declined since his resignation on March 15, 2011.) However, Mr. Minkow knew he was going to jail, he knew he had to resign, and he wanted to do the right thing. Understandably, he left some of the Church's members angry and disappointed. In addition to what he had done for CBC, Mr. Minkow had made money for many of its members when they joined him in short-selling stock and when they invested in "Minkow, The Movie," a feature film soon to be released and starring Mark Hamill, Ving Rhames, James Caan, Talia Shire and Armand Assante. A copy of the IMDB[1] page establishing the movie is attached hereto, incorporated by reference herein and marked Exhibit "E". Mr. Minkow also fully expected to be able to pay the investors in his movie. Attached hereto, incorporated by reference herein and marked Exhibit "F" is a contract between Mr. Minkow and IMG Film (the producer). Among other matters, a fee was to be paid pursuant to paragraph 2(a) of $750,000 to Mr. Minkow which was to be used to pay the investors in substantial part.

Again, attorney Forney's letter is not truthful with both what it says...and what it does not say. It talks about harm, losses, debt and liability, but offers no details, no amounts, and no explanation. However, in an email, dated as late as July 10, 2011, from Dennis LaVorgna to Tony Nevarez, Subj: Elder Board Actions, and forwarded to Mr. Minkow that same date, Mr. LaVorgna begins by saying "once again I am upset with the actions of the Elder Board and believe strongly that the Board is violating its authority and is being driven by anger and hatred." Mr. LaVorgna writes

---

[1] International Movie Data Base.

"that in my opinion, it was exceedingly wrong for CBC to take matters to Barry's probation officer with the intent on causing him damage." Further, Mr. LaVorgna writes that "as an experienced Forensic accountant, I GUARANTEE that you could NOT have performed an adequate audit this soon, and with this limited talent." Attorney Forney did not include this email but it will be provided for this Court's review. A copy of the LaVorgna letter is attached hereto, incorporated by reference herein and marked Exhibit "G".

In support of the above is a recent letter from a CBC Elder, who wrote this Court before attorney Forney's letter and has now found it necessary to write again and explain "a majority of the issues raised in the letter were known to the Board back in the summer of 2010....and that at the end of that investigation...Mr. Nevarez stated emphatically that the issue was closed." According to this Elder's letter, (1) "the church retained an outside law firm who determined Mr. Minkow's gifts far exceeded the amount of money he was accused of co-mingling." (Again, consistent with the September 27, 2010 meeting minutes) and (2) "Mr. Minkow was cleared of wrong-doing but reprimanded for horrible judgement and thinking that he was alone burdening the financial obligations of our church body–a problem we had over and over with him." This powerful letter concludes with the following: "...I found it completely fascinating that 2 days after our church wrote their letter, the Securities and Exchange Commission on June 30th, 2011 decided to weigh in (already filed with this Court) on Barry's behalf–something his own church refused to do. Your Honor it is not Barry I am saddened for, it is his dear wife Lisa who watched him build a church at the very expense of his family (everyone on that Board knew Barry worked 15 hours a day 7 days a week and I for one am ashamed for not stopping it sooner) from 135 adults in March of 1997 to almost 2000 people on Easter Sunday 2009 and 2010." This individual was a member of the Elder Board during

6

the time frame when Mr. Minkow was allegedly acting without the knowledge of the Elder board[2]. His letter makes clear that Mr. Minkow acted with the Boards knowledge and license. A copy of this Elder's letter has been provided to probation to provide to the Court, as he has requested the balance of his letter to be confidential. A copy has also been provided to the Government. We have been requested to provide this letter to the Court in this fashion as the Elder in question has been threatened by other members of the Elder Board if he takes a position in support of Mr. Minkow.

Many other letters have been written on behalf of Mr. Minkow and have been forwarded to this Court for consideration. However, letters continue to be received every day. Most recently, Phil Sprague, President and CEO of Profiles Research Services, LLC, and a long time CBC member has written this Court. His letter is insightful and he struggles to understand Mr. Minkow the minister and Mr. Minkow, the defendant in this case. However, Mr. Sprague's career began with the Dallas Police Department and the Dallas County District Attorney's Office and he concludes his letter by stating, "I hope to have Barry as our Global Contracts Manager and Negotiator. This is the confidence I have in Barry." Mr. Sprague's letter is attached hereto, incorporated by reference herein and marked Exhibit "I".

There is Tony Jaime, Senior Pastor of Ravensdale Bible Church in the Seattle area of Washington and Mr. Minkow's best friend, who's July 5, 2011 letter details all the good Mr. Minkow has done over the years and his substantial assistance and contributions to the government. The Pastor's letter is also supported by former CBC member Shannon Boelter. A copy of Pastor Jaime's letter is attached hereto, incorporated by reference herein and marked Exhibit "J".

---

[2] Attached hereto, incorporated by reference herein and marked Exhibit "H" are the Minutes of Board meeting held in August 2010, which shows the presence of writer of this letter as a member of the Board.

Finally, Mr. Minkow needs to speak for himself. He has written a letter to the Court reaffirming his acceptance of responsibility. A copy of Mr. Minkow's letter is attached hereto, incorporated by reference herein and marked Exhibit "K". Barry writes, "I am most sorry for the pain I have caused to those that I had co-labored with and served. Of course by making such a statement, . . . I am in no way attempting to deprecate the significance of the harm and cost I caused to Lennar corporation." In his letter, there are no excuses, no mitigation, simply an admission that he is a "37 year old loser" who is sorry for what he has done.

It is only when reading the balance of the letters provided to you from wife, some former parishioners, the SEC and others that a nuanced, highly complicated and somewhat flawed individual appears. Barry Minkow is not an easy person to evaluate, or for this Court to sentence. He has done some very good and some very bad things, in this his "second" life. It is perhaps easiest to think of him as Icarus who flew too high on wings of wax. Mr. Minkow knows this Court will sentence him to return to prison. He only asks that the bad be balanced by the good and tempered by the potential for the future. Mr. Minkow is capable of making great contributions to society as long as those "inner demons" which have caused him to fail are contained. We firmly believe that they can be contained..

In conclusion, Mr. Minkow asks this Court not to consider the letter from attorney Forney. It is both prejudicial and factually inaccurate.

4. The probation officer continues to assert that the victim of this offense, Lennar Corporation, is entitled to restitution in the amount of $583,573,600 and has provided a letter from Lennar's attorney, Daniel Petrocelli. Mr. Minkow's position remains that it was the stockholders of Lennar and not Lennar itself who suffered losses as a result of the offense; however, they only lost money if they had actually sold their holdings in Lennar and a time the offense had a direct bearing

on the market. Again, Mr. Minkow asks the government to identify those stockholders and their individual losses.

5. As previously stated in Mr. Minkow's Objections to the Presentence Investigation Report and Request for Alternative Sentence, Mr. Minkow has asked this Court to consider downward departures due to his serious health conditions, § 5H1.4, and because he has not benefitted from the expected reduction for his complete and timely acceptance of responsibility, U.S. v. Rodriguez, 64 F. 3d 638 (11th Cir. 1995). He has also asked this Court to consider the sentencing factors of 18 USC § 3553 and, specifically, his personal history, his substantial assistance to the government over these many years, his very significant family ties and responsibilities, and his battles with substance abuse.

WHEREFORE the Defendant prays this Court sentence him to a sentence consistent with the goals of 18 USC § 3553(A).

        ENTIN & DELLA FERA, P.A.
        110 SE 6th Street, Suite 1970
        Fort Lauderdale, Florida 33301
        Telephone:  (954) 761-7201
        Facsimile:   (954) 764-2443

        By:  s/ Alvin E. Entin
            ALVIN E. ENTIN
            Fla. Bar No. 127027

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 19, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either by transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

        s/ Alvin E. Entin