```
 1                 IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                            ---oOo---

 4          BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

 5

 6   UNITED STATES OF AMERICA,

 7          Plaintiff,

 8   Vs.                              CASE NO. CR. S-07-229 KJM

 9   RONALD GROVES, DONALD MANN,

10          Defendants.

11   _____/

12

13

14

15                            ---oOo---

16

17                       REPORTER'S TRANSCRIPT

18                     THURSDAY, MAY 26TH, 2011

19      EXCERPT FROM TRIAL - TRIAL TESTIMONY OF BARRY MINKOW

20

21                            ---oOo---

22

23

24

25   Reported by:               CATHERINE E.F. BODENE,
                                 CSR. No. 6926
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
1                           APPEARANCES

2                            ---o0o---

3

4    For the Government:

5            UNITED STATES ATTORNEYS OFFICE
             501 I Street, 10th Floor
6            Sacramento, California  95814

7            BY:  STEVE LAPHAM,
                  Assistant U.S. Attorney
8
             BY:  DOMINIQUE THOMAS,
9                 Assistant U.S. Attorney

10

11

12

13   For the Defendant Groves:

14           MICHAEL E. HANSEN,
             Attorney At Law
15           711 Ninth Street, Suite 100
             Sacramento, California  95814
16

17

18   For the Defendant Mann:

19           OLAF WILLIAM HEDBERG,
             Attorney At Law
20           901 H Street, Suite 673
             Sacramento, California  95814
21

22

23                           ---o0o---

24

25
```

```
 1                         EXAMINATION INDEX

 2                            ---oOo---

 3

 4    FOR THE GOVERNMENT:

 5         EXAMINATION:                                PAGE

 6

 7     BARRY MINKOW

 8         Direct Examination by Mr. Lapham              2
           Cross-Examination by Mr. Hedberg             34
 9         Cross-Examination by Mr. Hansen              39
           Redirect Examination by Mr. Lapham           41
10         Recross-Examination by Mr. Hansen            42

11

12                            ---oOo---

13

14                         EXHIBIT INDEX

15                            ---oOo---

16

17    GOVERNMENT'S
      EXHIBIT NO              DESCRIPTION          ID    EVD
18

19      101                   Recording                  27

20

21

22                            ---oOo---

23

24

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1

SACRAMENTO, CALIFORNIA

THURSDAY, MAY 26TH, 2011

---o0o---

1
2
3
4    (Excerpt from trial proceedings.)
5    (Back on the record at 10:30 a.m.)
6    THE CLERK:  Please, remain seated.  Come to order.
7  Court is again in session.
8    THE COURT:  All right.  Are we ready to proceed?
9    MR. LAPHAM:  Yes, Your Honor.
10    MR. HEDBERG:  Yes.
11    THE COURT:  Mr. Hansen, you're ready?
12    MR. HANSEN:  I'm ready.  Thank you.
13    THE COURT:  All right.  We can bring the jury in,
14  Mr. Owen.
15    (Jury seated at 10:31 a.m.)
16    THE COURT:  Welcome back, Ladies and Gentlemen of the
17  Jury.  I hope you had a good break.
18    We will now proceed with the government's case and go
19  until at least 11:45, maybe a little bit later, and take our
20  next break.
21    Mr. Lapham.
22    MR. LAPHAM:  Your Honor, the United States calls
23  Barry Minkow.
24    THE CLERK:  Mr. Minkow, can I please have you remain
25  standing.

2

```
 1            THE WITNESS:  Yes, sir.
 2            THE CLERK:  Raise your right hand, please.
 3                       BARRY MINKOW,
 4   was thereupon called as a witness herein by the Government,
 5   and having been sworn to tell the truth, the whole truth and
 6   nothing but the truth, was thereupon examined and testified
 7   as follows:
 8            THE CLERK:  You can be seated.
 9            Can I have you state your full name and spell your
10   first and last name, please.
11            THE WITNESS:  Barry - B-a-r-r-y, J., Minkow -
12   M-i-n-k-o-w.
13            THE COURT:  You may proceed.
14            MR. LAPHAM:  Thank you, Your Honor.
15                       DIRECT EXAMINATION
16   BY MR. LAPHAM:
17   Q.    Mr. Minkow, where do you reside?
18   A.    Crossville, Tennessee.
19   Q.    How are you employed at the current time?
20   A.    I work for the Law Offices of Christopher Grow as a
21   law clerk and researcher.
22   Q.    Have you previously been convicted of a crime?
23   A.    Yes, sir.
24   Q.    What crime was that?
25   A.    Securities fraud in 1988.
```

```
                                                                3
 1    Q.      How hold were you at the time?
 2    A.      I was 16 when I started the company, and I was in
 3    prison from 21 to 29 years old.
 4    Q.      So you were convicted around the age of 21?
 5    A.      Yes, sir.
 6    Q.      And you say "the company."  What company was that?
 7    A.      ZZZZ Best Carpet and Furniture Cleaning.
 8    Q.      What did that criminal case involve?
 9    A.      It involved me lying about what the company owed and
10    lying about what the company earned and essentially
11    defrauding Wall Street.
12    Q.      Was this a publicly traded company?
13    A.      Yes, sir, it was.
14    Q.      What was your position with that company?
15    A.      The CEO and founder and majority stockholder.
16    Q.      At the age of 21?
17    A.      Yeah.  But I was a crook so it is not impressive.
18    But yes, sir.
19    Q.      Was that a federal conviction?
20    A.      Yes, sir.
21    Q.      How much time did you serve?
22    A.      87 months.  I went in at 21 and got out at 29.  Eight
23    Super Bowls.  I always counted Super Bowls, not birthdays.
24    Q.      What did you do after you got out of prison?
25    A.      Began to educate the FBI and law enforcement on how
```

4

1    to uncover fraud.

2    Q.      How did you do that?

3    A.      I went to Quantico, Virginia, two weeks after I got

4    out of prison and trained the agents there.  Before 911 you

5    could sleep in Quantico, and I did that and trained new

6    agents.  And then did FBI bank day in L.A. in '95.  Then from

7    there the Pentagon and all the way up until, you know, pretty

8    much almost the present.

9    Q.      Now, what type of training did you provide to the FBI

10   and these other government agencies?

11   A.      Essentially the techniques perpetrators of white

12   collar crime, like myself, use to defraud Wall Street and

13   investors.

14   Q.      What kind of techniques would those involve?

15   A.      They would range from, you know, untenable returns to

16   sources and uses of cash audits to no independent proof of

17   profitability.

18           Red flags that are almost always present or

19   consistent in investment scams like the one I, much to my

20   shame, perpetrated.

21   Q.      Did you ultimately start up another business?

22   A.      I did.

23   Q.      What was that business?

24   A.      The Fraud Discovery Institute.

25   Q.      When did you start that business?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

5

1    A.      In 2001 I started.  I was also pastoring a church at

2    the time.

3    Q.      I'll get to that in a minute, but where was this

4    Fraud Discovery Institute located?

5    A.      In San Diego.  I was the co-founder.

6    Q.      And what was the nature of that business?

7    A.      To train state CPA societies.  Accountants need CPE

8    continuing education credit.  And I was paid to go speak and

9    train because a component of that CP was fraud training for

10   auditors so that they can uncover fraud in private or public

11   companies they audit.

12   Q.      So what types of services did you personally perform?

13   A.      Teaching and training.

14           I'm sorry.  I'm popping.  (Referring to mic.)

15           Teaching and training.

16   Q.      And you got your income primarily from teaching and

17   training at that point in time?

18   A.      And I was at that time drawing a salary at the church

19   I was the pastor of.

20   Q.      Tell us about that.  At some point did you go back to

21   school and get further education?

22   A.      Yes.  When I got out of prison, I went back to

23   Liberty University and got my Masters of Divinity Degree.

24   And I graduated in November of '96 with a divinity degree.

25   And that was on campus.

6

1        Then I got a honorary doctorate in June 2010.  I

2  didn't earn it.  It was given to me, I didn't earn it, from

3  Southern California Bible College and Seminary.

4  Q.     All right.  Then you were involved in your own

5  church?

6  A.     In March of 1997 I took over as senior pastor of

7  Community Bible Church in San Diego, California.

8  Q.     Now, as part of the Fraud Discovery Institute, did

9  you have occasion to uncover various types of fraud on your

10  own?

11  A.     Yes, sir.  The first case was 2003.  Yes, sir.

12  Q.     And how would that come about?

13  A.     Well, I have a very good friend.  His name is Lance,

14  and he was pitched on a $250,000 investment opportunity in a

15  company called MX Factors.  He asked me to look at the

16  offering memorandum and see if it was okay to invest in.

17        And I said what do I know about that?  He said:

18  Well, don't you train the FBI and uncover fraud?  Can't you

19  uncover fraud yourself?

20        I thought he had a point, and I looked at it.  And it

21  ended up being a $50 million ponzi scheme we had uncovered.

22  Q.     All right.  So the first occasion was just a private

23  friend -- a personal friend asking you to take a look at

24  something?

25  A.     Yes, sir.

7

1    Q.      Did you then start to develop an actual business in

2    uncovering fraud?

3    A.      Yeah.  Because of the notoriety that surrounded the

4    uncovering of the MX Factors case, it led to the next case

5    which was a 800 million dollar fraud, Financial Advisory

6    Consultants, a fraud case out of Orange County.

7    Q.      The MX Factors case was the first case that your

8    friend told you about?

9    A.      Yes.

10    Q.      All right.  And the next case, what did that involve?

11    A.      It involved a 20-year ponzi scheme.  At that time it

12    was the longest running ponzi scheme that we were aware of.

13    And James Lewis ended up getting 30 years for it, and it was

14    initially a 814 million dollar ponzi scheme.

15           And one of the investors read about me in MX Factors

16    and said that there are points of similarity between

17    MX Factors and this, would you take a look.

18           So more lucky than good.

19    Q.      All right.  So what would you do when you would

20    uncover what you thought might be a fraudulent scheme?

21    A.      After Financial Advisory Consultants, then we really

22    started to get a lot of people calling.  And typically I

23    would report to the authorities when I thought that there was

24    high likelihood of a financial crime in progress after being

25    contacted, unsolicited, by people calling me saying, "Hey,

8

1    I'm in an investment, I read about you in the paper, can you

2    check this out."

3           So we didn't solicit people.  They came to us.

4    Q.     All right.  Did you have an on-going relationship

5    with law enforcement?

6    A.     Yes, I did.  The law enforcement that I taught and

7    trained were the ones I actually developed and cultivated

8    relationships with in referring.  And I was at the SEC and

9    the FBI.

10   Q.     So when you came across a referral from someone who

11   came to you asking for your opinion, and you made some kind

12   of determination there might be fraud here, to whom would you

13   go?

14   A.     Three people.  Special Agent Peter Norell.  He was

15   the supervisor at Santa Ana FBI.  Special Agent Matt Galioto

16   from Long Island FBI.  And Peter Del Greco at the Securities

17   and Exchange Commission in Los Angeles.

18          Then on occasion if a California based entity, venue

19   for the California Department of Corporations and Karen

20   Patterson.

21   Q.     All right.  And overall how many cases did you help

22   make with respect to fraudulent schemes?

23   A.     Twenty-two totaling over a billion-something.

24   Q.     When you -- I use the word "made those cases," but

25   did you actually continue the investigation after you came to

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

9

1   a preliminary determination of the case?

2   A.      Normally and regularly, if we identified what we

3   believed was a financial crime in progress, we would refer it

4   to the FBI and SEC and then seek permission from the Bureau

5   to gain additional information on that particular investment

6   opportunity by securing the offering memorandum, writing up a

7   report and submitting it to law enforcement.

8   Q.      And then after doing that, you would submit a report

9   to the FBI or some other agency?

10  A.      Yes, sir, I did.

11  Q.      And where did -- where would the case go from there?

12  A.      Well, I hoped it would get prosecuted in either.  If

13  the SEC, a TRO, Temporary Restraining Order, or the FBI, that

14  they would shut down the entity so more people wouldn't

15  invest and get hurt.

16  Q.      And in 21 instances it actually resulted in a

17  criminal case being actually developed and prosecuted to

18  completion?

19  A.      That or the civil case with the Securities and

20  Exchange Commission shutting them down uncontested and no

21  more investors.  So either civil SEC or criminal FBI.

22  Q.      With respect to those cases, did you derive any

23  compensation from law enforcement for your efforts?

24  A.      No.

25  Q.      Where did your compensation, if any, come from?

10

1    A.        Well, I pastored the church.   I would do speaking

2    gigs.   I never charged law enforcement, but I charged CPA

3    societies.

4              And I wrote a book, and my mom bought a million

5    copies.   And it hit the New York Times Best Seller List so,

6    yeah, I wrote a book.   And often in the book I would refer to

7    cases we had uncovered so that's how, sir.

8    Q.        All right.

9              While you were operating the Fraud Discovery

10   Institute, did you have occasion to investigate a company

11   called Money Growth Solutions?

12   A.        Yes, sir.

13   Q.        And how did that -- How did you become aware of that

14   company?

15   A.        A gentleman from San Diego e-mailed me who had

16   invested $2500 into the company and said that Mark Matthews

17   had referred him to contact me because he was concerned about

18   his investment.

19   Q.        All right.   When did that contact occur?

20   A.        March 17th, 2006.

21   Q.        And for how long did you investigate Money Growth

22   Solutions?

23   A.        About a month.

24             Kevin Jones was the guy who e-mailed me, by the way.

25   He was -- I believe he had the 2500 invested in Money Growth

11

1    Solutions and said Mark Matthews had referred him.

2           And we took about four to five weeks investigating

3    the company as I recall.

4    Q.      Okay.  And then what happened after that?

5    A.      The FBI raided the --

6    Q.      Actually, what I meant to say is after you completed

7    your involvement in the case.

8    A.      Yeah.  I issued a report, submitted it to law

9    enforcement, and also introduced an agent from the FBI as a

10   prospective investor to continue on.

11   Q.      All right.

12          Did you have any further involvement in the case

13   after that until today?

14   A.      No, sir.

15   Q.      Okay.  Now, have you recently been or pled guilty to

16   another federal offense?

17   A.      March 22nd, yes.  I pled guilty to one count of

18   securities fraud.

19   Q.      March 22nd of this year?

20   A.      My birthday.  Yeah.

21   Q.      And what was the nature of that offense?  What did

22   that involve?

23   A.      It involved an investigation that I was hired to

24   conduct by a builder with Lennar Corporation, which is a

25   public company on the New York Stock Exchange.

12

1    Q.      So what did you do?

2    A.      I issued a report that caused their stock to drop

3    about a half a billion dollars in value in two days and

4    wrongly leveraged the goodwill that I had earned with Wall

5    Street and law enforcement for my own personal gain.

6    Q.      So you published a negative report about the company?

7    A.      That contained information that was not entirely

8    corroborated or verified at the time.

9    Q.      And how did you financially gain by that?

10   A.      I shorted the stock and nominee names, but then said

11   that I wasn't shorting the stock.

12   Q.      Okay.  Explain to the jury what you mean by "shorting

13   a stock."

14   A.      Stocks -- If you buy stock and hope it goes up,

15   shorting a stock means you're betting it will go down.  So

16   I -- "Shorted" means I bet that the stock would go down.

17   Q.      All right.

18           So you published negative information knowing that

19   because of your reputation it would be taken seriously by the

20   public?

21   A.      Yeah.

22   Q.      And you took short positions in the stock, and you

23   did that not in your name, but other people's names?

24   A.      Yes, sir.

25   Q.      And the reason you did it in other people's names was

13

1    what?

2    A.      To conceal it.

3    Q.      All right.

4            Are you currently pending sentence in some other

5    court?

6    A.      In Miami eventually.  Yes, sir.

7    Q.      That's where you were prosecuted and pled guilty?

8    A.      Yes, sir.

9    Q.      All right.  When is sentencing in that case?

10   A.      Tentatively next month, but I don't know at this

11   point, sir.

12   Q.      All right.  So let me go back to your involvement

13   with Money Growth Solutions.

14           Tell the jury, again, if you would, your first

15   contact about that case.

16   A.      Kevin Jones e-mailed me March 17th, 2006, and I asked

17   him for the offering memorandum that he relied upon to invest

18   into Money Growth Solutions.  And he indicated that he was

19   going to give it to me, but he was reluctant that his name

20   would be used in any report, which is typical with whistle

21   blowers in my experience.

22   Q.      Incidentally, let me -- I forgot to ask you a

23   question about your conduct for which you recently pled

24   guilty.

25           The conduct that you engaged in, over what period of

14

1   time did you engage in that conduct?

2   A.      March -- Excuse me.  January 9th, 2009 to March 15th,

3   2011 when I resigned from my church after 14 years.

4   Q.      All right.

5           What did you do after receiving this contact from the

6   Money Growth Solutions investor?

7   A.      I did three things.  I asked the client to send me

8   the offering memorandum so I could view it.  I contacted

9   Peter Norell at the FBI, and I contacted Matt Galioto at the

10  FBI in Long Island and asked -- and indicated that I think we

11  may be on to something that appears to be, at least in my

12  view, a financial crime in progress, and I think it is worth

13  us gathering more information.

14          That's what I did.

15  Q.      How did you draw that determination just based on the

16  preliminary information that you had received?

17  A.      The client had invested $2500, yet his return of that

18  money had been, I think, three or four months late at the

19  time he first contacted me.  And that's not -- in my view it

20  wasn't a lot of money so I thought is this imploding.  Again,

21  I didn't know for sure.

22          And then he mentioned he was getting 10 to 1 returns,

23  which was untenable in my experience.  But I could be wrong.

24  I just didn't know.

25  Q.      What was the purpose of contacting the FBI?

15

1    A.      To seek permission to, A, pose as an investor.  B,

2    record calls with the promoter of the investment opportunity.

3    And C, secure additional offering memorandum data.

4    Q.      All right.

5            Did you have occasion to visit the Money Growth

6    Solutions website?

7    A.      Yes, sir.

8    Q.      At around this time?

9    A.      I did.  Yes, sir.

10   Q.      What did you -- what, if anything, did you glean from

11   that website?

12   A.      Well, as I recall they didn't have a whole lot of

13   information regarding the investment opportunity, but it was

14   a lot of:  We do good things in Fiji, we help third-world

15   countries.  That kind of thing as I recall, but nothing about

16   the investment opportunity.  Yeah.  I'm sorry.

17   Q.      Was that of concern to you?

18   A.      It just seemed like they were doing the imputed

19   credibility thing, that infer from this website that

20   everything we say is legit because we do good things kind of

21   thing.  So that was just my initial inference.

22   Q.      Were you able to obtain any information from that

23   website about any investment opportunities they had?

24   A.      No.  As I recall, it was just about the good things

25   they were doing.  I don't think that they had any offering of

16

1   any investment on that website as I recall.

2   Q.      Did the website list who was involved with Money

3   Growth Solutions?

4   A.      I believe it mentioned Mr. Ron Groves and Mr. Don

5   Mann.

6   Q.      Do you remember how they were characterized?

7   A.      Not offhand, sir.  I'm sorry.

8   Q.      All right.  What did you do next?

9   A.      I pressured Mr. Jones to quickly get me the offering

10  memorandum stuff.  I called him and said that I would like to

11  get that quick, sooner as opposed to later, because I wanted

12  to forward it to the FBI so that I could quickly secure

13  permission to record calls and pose as an investor, which was

14  our typical way of doing things at the time.

15  Q.      Did he provide you with those documents?

16  A.      He did.  On March 23rd, about six days after our

17  call.  The 17th to the 23rd -- yeah, the 23rd he faxed them

18  to me.

19  Q.      All right.  And did you review those documents?

20  A.      Yes, sir.

21  Q.      And what -- Did you make any determinations based on

22  those documents?

23  A.      Yeah.  As I recall, everything that the client,

24  Mr. Jones, had initially e-mailed me about was corroborated

25  in the documents that he had signed.  So he was telling me

17

1    the truth.

2    Q.     All right.

3          And what rate of return -- Based on those documents

4    that he sent you, what rate of return was Mr. Jones being

5    promised?

6    A.     As I recall the initial investment was double, which

7    would have been 2400 percent.  And then for five months he

8    was given that amount.  That was doubled.

9          So if it was 10,000 investment, as I recall 20,000

10    was given back within 30 days on one payment -- on one

11    option.  Then for five months you got 20,000, which was about

12    8865 percent annualized return.

13    Q.     Let's go back because you said a lot during that

14    answer.

15    A.     Sorry.

16    Q.     First of all, just looking at the investment

17    documents themselves, what type of a return was promised in

18    those documents?

19    A.     I believe it was 10 to 1.

20    Q.     All right.  And how was that to be paid out?

21    A.     Thirty days you get your money back, and then for

22    five months after that, that money you got back, if it was

23    10,000 you invested, you got back 20.  You got 20 for 20

24    straight weeks or five months.

25    Q.     They calculated that to be a 10 to 1 return.  Did you

18

1   come up with a different calculation?

2   A.      Yeah.   Because if you get your money doubled in one

3   month, that's 2400 percent return annualized.

4           And then if you're getting that doubled amount for

5   five more months or 20 more weeks, we -- our CPA calculated

6   it at 8865 percent return annualized.

7   Q.      You hired a CPA to investigate that particular

8   question?

9   A.      That alone.   Will Sanchez.   He charged me 400 bucks

10  for one little calculation.

11  Q.      So math can pay.

12  A.      I wouldn't know.

13  Q.      All right.

14          So was that an additional red flag for you, the

15  interest rate annualized?

16  A.      Yes, sir.

17  Q.      After receiving those documents from the investor,

18  what did you do next?

19  A.      I faxed them to Mr. Norell and Mr. Galioto at

20  Long Island FBI and Santa Ana FBI.

21  Q.      I'm sorry.   I --

22  A.      I faxed the offering.   What I got from the client, I

23  immediately turned over to the government, the FBI in

24  Santa Ana and in Long Island.

25  Q.      All right.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

19

1        Did you also have communications with the Department
2    of Corporations?
3    A.      I did.  Karen Patterson.
4    Q.      And explain to the jury, if you would, what the
5    Department of Corporations is?
6    A.      They're like the state SEC equivalent.  They
7    investigate for companies located in California, alleged
8    securities fraud, companies that are offering investment
9    opportunities and so forth that aren't properly registered
10   with the State of California.
11   Q.      And why did you contact the Department of
12   Corporations?
13   A.      Because Miss Patterson and I had done several cases
14   before.  And she's very good at what she does, and I wanted
15   to find out if Mr. Groves or Mr. Mann were licensed broker
16   dealers, and if the offering they were offering in the State
17   of California had been blue-skied, which means simply that it
18   was approved to be solicited to others in this state.
19         And she reported that neither Mr. Groves or Mr. Mann
20   were licensed broker dealers, nor their offering memorandum
21   registered --
22         MR. HEDBERG:  Hearsay, Your Honor.
23         THE COURT:  Mr. Lapham?
24         MR. LAPHAM:  I'll withdraw the question.
25         THE COURT:  All right.  The question is withdrawn.

20

1    The jury shall disregard the last sentence of Mr. Minkow's

2    response.

3    BY MR. LAPHAM:

4    Q.      Did you inform Miss Patterson that you were

5    contemplating conducting an investigation -- further

6    investigation of this company?

7    A.      Yes, sir.

8    Q.      And what was the purpose for informing her of that?

9    A.      To put it on her radar as a potential case because it

10   had venue in the State of California, and to ascertain

11   whether or not Mr. Groves or Mr. Mann were licensed broker

12   dealers.  If the offering was --

13   Q.      Then you talked about contacting the FBI.  What

14   further -- where did you want to take this case at that

15   point?

16   A.      Based on the rate of returns being so high, I felt it

17   was a very severe -- I felt it was imploding, and I felt

18   urgency.  So I was basically trying to get whatever agency I

19   could interested as quickly as I could to get it down -- if

20   it was a fraud, to get it shut down as quickly as I could.

21   Q.      Did you get permission from the FBI to go forward

22   with an investigation?

23   A.      Yes.

24   Q.      What permission did you get?

25   A.      I got it twice.  One from Special Agent Galioto who

21

1    said you can record calls after he received the offering

2    memorandum, and then later from Special Agent Supervisor

3    Norell in Santa Ana.

4    Q.      Why did you need permission from the FBI to record

5    calls?

6    A.      I'm a private citizen.  In California, if you're

7    going to record a call, you have to have the permission of

8    both parties so it would have been unusable evidence.

9    Q.      All right.

10          Now, did you also get permission from the FBI to use

11   something other than your true name?

12   A.      Yes.

13   Q.      Why was that?

14   A.      I was on 60 Minutes in May of '05.  Based on the

15   cases we had uncovered, they did a very positive --

16   undeserved positive piece.  And everybody knew my name so I

17   was kind of like dead in the water for undercover ops after

18   that.  So I just changed my name for undercover ops, but I

19   had permission most the time.

20   Q.      And, in fact, do you know if that 60 Minutes piece

21   played any role in you're getting the referral in this case?

22   A.      Yeah.  I believe Mark Matthews, who referred Kevin

23   Jones to contact me, had seen the piece and was aware of our

24   work.

25   Q.      He said that?

22

1   A.      As I recall.  I could be wrong, but that's my

2   recollection.

3   Q.      Okay.  Did you, in fact, make contact with Money

4   Growth Solutions?

5   A.      I did.

6   Q.      When did you do that?

7   A.      I think I did it four times, but I think the first

8   time was asking Mr. Groves to send me the offering materials

9   saying that I was referred to his investment.

10          The second time was on March 27th, I believe, where I

11  did a recorded call.

12          The third time was on March 29th while I was in

13  Washington, D.C.

14          And then the final time was at the behest of Special

15  Agent Norell to introduce somebody on his squad as a

16  potential investor.  So four times.

17  Q.      When was the first call?

18  A.      I think it was the 23rd, as I recall.

19  Q.      All right.  And what was the purpose of contacting

20  Money Growth Solutions on that occasion?

21  A.      To get the offering memorandum to see if I was going

22  to get documents that were consistent with what my client,

23  Mr. Jones, had received.

24  Q.      Okay.  And did you place that call?

25  A.      Yes, sir.

23

1   Q.      And whom did you talk to on that occasion?

2   A.      Mr. Groves.

3   Q.      And how did you present yourself?

4   A.      As Doug and my wife Karen, who is a CPA, we want to

5   invest, we heard about your program.  I believe I mentioned

6   Mr. Kevin Jones referred us to it because he was already in.

7   I don't recall necessarily for sure, but I think that's what

8   I did.

9           And then I said, you know, we would like to invest,

10  can you -- we're anxious, can you fax me over your contracts

11  that are needed to get into your investment opportunity.

12  Q.      And what was Mr. Groves' response?

13  A.      He was -- After hearing -- I think I recall after

14  hearing I was referred by somebody already in, he complied

15  rather quickly with the request.

16  Q.      Did the papers you received -- Well, did you

17  ultimately receive papers from Money Growth Solutions?

18  A.      Yes, sir.

19  Q.      And what did those consist of?

20  A.      Joint Venture Agreement, as I recall.  There was --

21  You know, that was the primary document.  Couple other

22  documents, as I recall, that were consistent with what I

23  would be investing in and what I would get in return for my

24  investment.

25  Q.      All right.

24

1    Did those documents differ in any way from the ones
2  you had previously received from Mr. Jones?
3  A.    Only on the amount invested.  So no, they were pretty
4  consistent with what Mr. Jones had.
5  Q.    Not sure what you mean by that.  What do you mean
6  "only on the amount invested"?
7  A.    I think Mr. Jones had his amount in his of what he
8  actually was investing so this one had that blank I think.
9  Q.    I see.  That hadn't been filled in?
10 A.    Right.
11 Q.    What did you do next?
12 A.    After that call and getting permission from the FBI
13 on March, I think it was, the 27th, we placed a recorded call
14 with Mr. Groves.  And that's standard.  We just want to know
15 four things:  How many are involved; how much has been
16 raised; what is the offered returns; and are you going to
17 give me -- are people being incentivized to bring friends in,
18 meaning will he pay me a commission to bring in others to the
19 promotion.
20    And those are consistent red flags with what we had
21 experienced with being fraudulent investments.  So those are
22 the fours things we were looking for on the call.
23 Q.    Now, that first call was not recorded; is that
24 correct?
25 A.    When I was asking for offering materials?

25

1    Q.      Yes.

2    A.      No, that was not recorded.

3    Q.      Did you discuss anything of substance with Mr. Groves

4    on that occasion or just ask for the materials to be sent to

5    you?

6    A.      My goal was to just get the materials at the time,

7    sir.

8    Q.      All right.

9            THE WITNESS:  May I get water, ma'am?

10           THE COURT:  You may.  Absolutely.

11              (Brief pause.)

12   BY MR. LAPHAM:

13   Q.      All right.  And did you place a call and record that?

14   A.      Yes, sir.

15   Q.      Were FBI agents supervising that call when you placed

16   it?

17   A.      I believe so, sir.  Yes, sir.

18   Q.      Actually, was there one on the line?

19   A.      Yes.

20   Q.      At the start of the call?

21   A.      Yes, sir.

22   Q.      And throughout the call?

23   A.      Yes, sir.

24   Q.      All right.  Who did you talk to on that occasion?

25   A.      Mr. Groves.

26

1    Q.      You already stated the purpose of the call -- This
2    call occurred on May 27th?
3    A.      It did.
4    Q.      Prior to coming into court today, did you listen to a
5    recording of that call?
6    A.      Yes.  One time we did.  Yes, sir.
7    Q.      That's been marked as Government's Exhibit 100?
8    A.      I believe so, sir, yes.
9    Q.      And as you were listening -- Or have you reviewed a
10   transcript of that call, and is that an accurate rendition of
11   the call?
12   A.      It is, sir.
13           MR. LAPHAM:  All right.  Your Honor, I move to admit
14   Government's Exhibit 101 at this time and ask if Miss Schultz
15   would distribute transcripts to the jury that are marked as
16   Government's Exhibit 101A.
17           THE COURT:  Did ask you the witness about 101?
18           THE WITNESS:  You said "100."
19           MR. LAPHAM:  Did I say 100?
20           THE COURT:  I'll allow you to ask the questioning
21   again to lay a proper foundation.
22   BY MR. LAPHAM:
23   Q.      The recording is Exhibit 101.  Is that the recording
24   you listened to?
25   A.      Yes, sir.

27

1    MR. LAPHAM:  Okay.  I would move to admit Exhibit 101

2  at this point.

3    THE COURT:  Any objection, Mr. Hedberg?

4    MR. HEDBERG:  No.

5    THE COURT:  Mr. Hansen?

6    MR. HANSEN:  Submitted.

7    THE COURT:  All right.  Exhibit 101 is admitted.

8        (Whereupon, Government's Exhibit Number 101 was

9        received into evidence.)

10    THE COURT:  In this instance as well, will the

11  parties stipulate the transcript of the call can stand as the

12  transcription of this record here in court?

13    Mr. Hedberg?

14    MR. HEDBERG:  Yes.

15    THE COURT:  Mr. Hansen?

16    MR. HANSEN:  Yes, I stipulate.

17    THE COURT:  All right.

18    That stipulation is accepted.

19    THE COURT:  The jury has been provided copies of the

20  transcript.  Now you would like to play that recording?

21    MR. LAPHAM:  Yes.

22    THE COURT:  All right.  You may now proceed.

23    (Government's Exhibit 101 published in open court.)

24    THE COURT:  All right.

25    Mr. Lapham, you may continue.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

28

1      MR. LAPHAM:  Thank you, Your Honor

2  BY MR. LAPHAM:

3  Q.      Mr. Minkow, just a couple follow-up questions on that

4  recording.  At the very beginning, you're referencing another

5  person named Karen, trying to get her on the line; is that

6  correct?

7  A.      Yes, sir.

8  Q.      And what was that all about?

9  A.      I had indicated to Mr. Groves that Karen, my wife,

10 was a CPA, and I wanted her on the call but was unable to do

11 so.  I never had any intention of putting her on.

12 Q.      All right.

13         And at some point in the recording there is a

14 discussion about a referral fee that you would be eligible

15 for or people would be eligible for?

16 A.      Yes, sir.

17 Q.      Did that cause you some concern as you made your

18 determination about this investment?

19 A.      It did because I'm not a licensed broker dealer;

20 therefore, I'm not entitled to receive a commission off the

21 sale of a security.  That would be illegal.  So to offer 20

22 percent or ten percent respectively, per the phone call --

23 taped phone call, it would be illegal for me to receive or

24 anybody to receive a commission for bringing somebody to the

25 investment opportunity.

29

1   Q.     Does that also increase the amount of money that has

2 to be made to investment so the pay out could be made?

3   A.     Yeah. I just was unaware of any entity that could

4 support the cost of capital being 9000 percent almost

5 annually, plus paying the incentives of 20 percent for

6 recruiting new people into the offering.

7   Q.     Now, at one point there is a discussion in here about

8 how they get their clients, and Mr. Groves says it is word of

9 mouth.

10         What did you think about that?

11   A.     I could be wrong, but I thought it was an affinity

12 fraud kind of thing.

13   Q.     What's "affinity fraud"?

14   A.     I'm your christian brother, drop your due diligence

15 guard, trust me, invest. Taking advantage within a community

16 of people of like faith, like ethnicity.

17   Q.     And at one point in the discussion you tried to get

18 the name the of the trader that they were working with?

19   A.     Jeri.

20   Q.     Right. And you asked for further information about

21 that. What was your thinking about that?

22   A.     At ZZZZ Best, when I perpetrated my fraud, I always

23 erected a wall between due diligence and my fraud. In my

24 case it was insurance jobs that we weren't doing that we said

25 we were doing. And when somebody wanted to verify them, we

30

1    would say:  We have a confidentiality agreement.  You can't

2    verify.  It was because they didn't exist.

3            That was a point of similarity here.  Jeri, the

4    trader, who generates these untenable returns, you can't get

5    to him.  You can't talk to him.  You can't reach him.

6            So whenever a wall is erected between you and due

7    diligence, it appears -- in my experience, I could be wrong,

8    it is just a red flag in my view.

9    Q.       Did you have another contact with the defendant, Ron

10   Groves, after this March 23rd call?

11   A.       The 27th call, sir, I think.

12   Q.       I'm sorry.  You are right.

13   A.       Yes.  The 29th, when I was in Washington, D.C.

14   Q.       And what was the purpose of that call?

15   A.       I wanted to let him know, because two days had passed

16   since I had last talked to him, that I was still viable,

17   still wanting to invest even though I hadn't.

18           I was trying to buy time, cultivate the relationship.

19   And I remember the call because I was in D.C. testifying in

20   front of the U.S. Senate on elder abuse fraud for

21   Senator Kohl.

22   Q.       In between the call on March 27th and the call on

23   March 29th, had you discussed this with the FBI?

24   A.       Yes.  Special Agent Norell specifically wanted me to

25   also introduce an agent from his squad as a prospective

31

1    investor as well.

2         He told me he didn't think a whole lot of my work, I

3    guess, because he wanted to corroborate it additionally.

4    Q.      That was the purpose for continuing the dialogue with

5    the defendant?

6    A.      Yeah.  To keep it alive.  Yeah.

7         He did that on occasion.  It was his prerogative to

8    bring in somebody from his squad.

9    Q.      Did the defendant -- Did the subject of your

10   investment come up during that conversation?

11   A.      In D.C.?

12   Q.      Yes.

13   A.      It did.

14   Q.      How did it come up?

15   A.      I told him that I'm in Washington, D.C., on a plane

16   coming home today so I won't be investing, don't panic, I got

17   called out of town.

18        And I said but I'm still interested, and he said

19   something very peculiar at that point.

20   Q.      What did he say?

21   A.      He said:  Is there any way you can get to a

22   Washington Mutual before close of business today and drop in

23   300 grand.

24        And I remember I was in D.C. in the hotel room

25   finished with the Senate stuff, and I about fell out of my

32

1    chair.

2    Q.      Why is that?

3    A.      We, who perpetrate fraud, don't show weakness.  If

4    you invest great, if not, your loss.

5            But to show that kind of weakness, in my view -- I

6    could be wrong -- it was just a red flag.  And I could be

7    wrong.  It was just my opinion.

8    Q.      Did it cause you concern about where Money Growth

9    Solutions was in their life cycle?

10   A.      Yeah.  Because my $2500 client, Mr. Jones, hadn't

11   been paid back.  He was late.  Somebody who was wanting a

12   half a million from me and it was still alive on the wire

13   shows a desperate move.  And he says give me 300 now, I was

14   like they're imploding.

15           And one of the things Mr. Groves indicated on the

16   call was people are refinancing their houses, and they're not

17   done yet, which is why he needed the 300 grand.

18           I'm thinking you have people losing their houses that

19   invested in this thing.  Let's move.

20   Q.      Did you have another call to the defendant,

21   Mr. Groves, after this March 29th call?

22   A.      Yeah.  One more call, sir.

23   Q.      What was the purpose of that?

24   A.      To introduce him to Tom, who was a prospective

25   investor, but really a FBI agent on Pete Norell's squad in

33

1  Orange County.

2  Q.      That was so the FBI could continue the investigation?

3  A.      Yes, sir.

4  Q.      On that phone call where you introduced Tom, he

5  wasn't on the call, was he?

6  A.      No.  It was just -- It was a call just to say that I

7  got a guy I want to invest, his name is Tom, he's going to

8  give you a call.  You know, he's a good guy, talk to him.

9  Q.      So was anything of substance discussed on that phone

10 call?

11 A.      Not that I recall, sir.

12 Q.      All right.

13         What, if anything, did you do with respect to this

14 case after that last phone call?

15 A.      I worked very hard over the weekend April 1, April 2,

16 to put together a report that we submitted to the FBI, SEC

17 and the California Department of Corporations, which is our

18 standard way of doing things.

19         It was about, with addendums, 40 pages.  It had the

20 banking account information, the offering memorandum, all of

21 that, and I submitted it to the various law enforcement

22 agents.

23 Q.      Did that report chronicle your activity in the case?

24 A.      Point by point, sir.

25 Q.      Did you have any further involvement with the

34

1    investigation after submitting that report?

2    A.      In 2009 I was called to testify in the trial, but

3    other than that, I thought -- I had no other involvement.

4    There was an article that came out in the Sacramento Bee a

5    couple days after that.

6    Q.      As far as investigative involvement?

7    A.      No.  I didn't want to get in the FBI's way.

8            MR. LAPHAM:  All right.  No further questions.

9            Thank you.

10           THE COURT:  All right.  Mr. Hedberg.

11                        CROSS-EXAMINATION

12   BY MR. HEDBERG:

13   Q.      Mr. Minkow, first of all, the person you spoke to in

14   that conversation was Ron Groves; isn't that right?

15   A.      Which conversation, sir?

16   Q.      The one we heard.  The one we heard played over the

17   audio here today?

18   A.      Yes, sir.

19   Q.      And the other conversations you had with people at

20   MGS were with Ron Groves; isn't that right?

21   A.      Yes, sir.

22   Q.      All right.  You never spoke to any one named "Don

23   Mann"; isn't that right?

24   A.      I don't recall, sir.  No, I don't think I have.

25   Q.      Okay.  Now, you've described a couple of convictions.

35

1    Your conviction involving the ZZZZ Best Company back in?

2    A.      1988, sir.

3    Q.      1988.  Okay.

4            Then you were convicted in March of this year for

5    engaging in securities fraud; isn't that right?

6    A.      Yes, sir.  I pled guilty to one count of conspiracy

7    to commit securities fraud.

8    Q.      As part of that, you executed a plea agreement; isn't

9    that right?

10   A.      Yes, sir, I did.

11   Q.      And when you executed that plea agreement, you did so

12   under penalty of perjury; isn't that right?

13   A.      Absolutely, sir.

14   Q.      That's the same oath you're testifying to under

15   today?

16   A.      Yes, sir.

17   Q.      And as part of that plea, you admitted to certain

18   facts; isn't that right?

19   A.      I did, sir.

20   Q.      And one of the facts that you admitted was that you

21   had obtained a special position of trust with the government;

22   isn't that right?

23   A.      I did, sir.  Yes, sir.

24   Q.      You used that position of trust to manipulate the

25   situation; isn't that right?

36

1    A.      Much to my shame, yeah.

2    Q.      Yes.  That's true, isn't it?

3    A.      A hundred percent.

4    Q.      To defraud owners of Lennar stock; isn't that right?

5    A.      Yes, sir.

6    Q.      For your profit; isn't that right?

7    A.      You're correct, sir.

8    Q.      How much profit?

9    A.      It was negligible.  I'm a very poor trader.

10   Q.      Okay.  Now, you were pastor of a church in San Diego;

11   isn't that right?

12   A.      Yes, sir.  For 14 years.

13   Q.      And you're not anymore; isn't that right?

14   A.      I resigned when I agreed to take the plea with the

15   Lennar case.  I stepped down.

16   Q.      Part of the plea process involved something called a

17   "debrief with the government"?

18   A.      Yes, sir.

19   Q.      And during that debrief you described certain things

20   that you had done; isn't that right?

21   A.      I did, sir.

22   Q.      Certain things that you had done in conjunction with

23   the church that you had been a pastor of; isn't that right?

24   A.      That's correct, sir.  Yes.

25   Q.      And some of the things you had described during the

37

1   debriefing that you had done in conjunction with the church

2   included obtaining loans in the name of the church through

3   fraudulent means; isn't that right?

4   A.      Yes.

5   Q.      Forging documents; isn't that right?

6   A.      That's what I admitted to.  Yes, sir.

7   Q.      Misappropriating parishioner money; isn't that right?

8   A.      Yes, sir.

9   Q.      This is all while you're the pastor; isn't that

10  right?

11  A.      For 14 years.  Yes, sir.

12  Q.      For 14 years.  Isn't that right, Mr. Minkow?

13  A.      That activity didn't occur for 14 years.  I was a

14  pastor for 14.  But yes, you are correct, sir.

15  Q.      It occurred at various times throughout the 14 years;

16  isn't that right?

17  A.      It started about halfway into my tenure.

18  Q.      That would be about 2005?

19  A.      Yes, sir.  About that time.

20  Q.      About the time you were involved with Money Growth

21  Solutions; isn't that right?

22  A.      Yes, sir.

23  Q.      And much of what you did involved misdirection of

24  funds into Fraud Discovery Institute; isn't that right?

25  A.      That's exactly right.

1    Q.       That's the same institute under whose umbrella you

2    were involved with Money Growth Solutions; isn't that right?

3    A.       A hundred percent.

4    Q.       In fact, you were involved in defrauding your own

5    parishioners while you were appearing in front of the Senate;

6    isn't that right?

7    A.       Yes.   That would be correct.

8    Q.       And I think that you had indicated -- Well, one thing

9    that you had indicated that you did as part of Fraud

10   Discovery Institute is you would report financial crimes in

11   progress; isn't that right?

12   A.       We did, sir.

13   Q.       But that's the crimes of other people, not the crimes

14   you were committing; isn't that right?

15   A.       Not at that time, sir.

16   Q.       Okay.   Not at that time?

17            So when did you report yourself as committing a

18   financial crime?

19   A.       When I agreed to plead guilty and not put the

20   government through going to trial.

21   Q.       So that process began with you calling the government

22   going:   Hey, government, I'm reporting myself?

23   A.       No.   I just accepted a plea.

24   Q.       Right.   Because you got caught?

25   A.       They had a -- They were about to accuse me.   Yes,

39

1    sir, you are correct.

2    Q.      And I think that you -- Well, you are currently

3    pending sentencing in that federal conspiracy case that we

4    just discussed; isn't that right?

5    A.      For the one count.  Yes, sir.

6    Q.      So that case is still in the balance, isn't it?

7    A.      I don't understand.

8    Q.      It's still in play?

9    A.      Oh, yeah.  Yes, it is.

10            MR. HEDBERG:  Okay.  Thank you.

11            I have nothing further.

12            THE COURT:  All right.

13            Mr. Hansen.

14            MR. HANSEN:  Thank you.

15                        CROSS-EXAMINATION

16   BY MR. HANSEN:

17   Q.      When you did release the negative press about Lennar

18   Corporation, your goal was to profit from that, correct?

19   A.      Yes, sir.

20   Q.      And, in fact, you made trades in large sums of money

21   under other people's names to do that?

22   A.      One person's name, sir, yes.

23   Q.      In your work with the Fraud Discovery Institute, you

24   say -- you use the word "red flag" a lot, right?

25   A.      I do, sir.  Yes.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

40

1    Q.      Things that bring to your mind possible fraud?

2    A.      Yes, sir.

3    Q.      One of those is the investor almost always steals

4    money for personal use?

5    A.      That's correct, sir.

6    Q.      So when you say people "steal money for personal

7    use," you mean to spend on things like homes and cars and

8    other things, correct?

9    A.      I do, sir.  Yes, you are correct.

10   Q.      And that's been your experience in a lot of these

11   discoveries that you have made or these exposures that you

12   have made?

13   A.      And what I personally know from perpetrating fraud,

14   yes.  At ZZZZ Best especially.

15   Q.      You also, in your experience investigating fraud,

16   have noted that most legitimate investments -- You state that

17   legitimate investments are usually in writing, correct?

18   A.      I don't understand, sir.

19   Q.      Let me put it to you this way:  If you were

20   investigating someone that you suspected of fraud, and they

21   offered to take your money without something in writing, that

22   would be a red flag for you?

23   A.      Yeah.   Yeah.  Yes, sir.  Depending on the

24   circumstances.  Yes, sir.

25   Q.      You agree legitimate investments are usually in

41

1   writing?

2   A.      Normally and regularly.  Yes, sir.

3   Q.      Also in your experience you've noticed that the

4   people you call "fraudsters," they increasingly use the

5   Internet to scam investors, right?

6   A.      I believe so.  Yes, sir.

7   Q.      But you didn't see any offerings at the Money Growth

8   Solution website to invest money?

9   A.      To their credit it was not on their website, sir.

10          MR. HANSEN:  Thank you.

11          THE COURT:  Mr. Lapham, will you have redirect?

12          MR. LAPHAM:  Just a few questions, Your Honor.

13          THE COURT:  All right.  Let's do that now.

14                      REDIRECT EXAMINATION

15   BY MR. LAPHAM:

16   Q.      Mr. Minkow, have you been promised anything in return

17   for your testimony today with respect to any pending case?

18   A.      No.

19   Q.      And Mr. Hansen asked you if legitimate investments

20   are usually in writing.

21          Are fraudulent investments frequently in writing?

22   A.      They are, sir.

23          MR. LAPHAM:  Thank you.  Nothing further.

24          THE COURT:  All right.

25          May Mr. Minkow step down, Mr. Hedberg?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

42

1          MR. HEDBERG:  Yes.

2          MR. HANSEN:  I have one other question.

3          THE COURT:  All right.

4                    RECROSS-EXAMINATION

5    BY MR. HANSEN:

6    Q.    Your plea agreement calls for a maximum sentence of

7    five years, right?

8    A.    It does, sir.

9          MR. HANSEN:  Thank you.

10         THE COURT:  Mr. Lapham?

11         MR. LAPHAM:  Nothing further.

12         THE COURT:  Mr. Minkow, you may step down.

13         THE WITNESS:  Thank you, ma'am.

14         (Whereupon, the trial testimony of Barry Minkow was

15          concluded.)

16                    ---o0o---

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2                         ---o0o---

 3
     STATE OF CALIFORNIA  )
 4   COUNTY OF SACRAMENTO )

 5

 6
            I certify that the foregoing is a correct transcript
 7
     from the record of proceedings in the above-entitled matter.
 8

 9

10            IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California on this 31st day of
11   MAY, 2011.

12

13

14   /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
15          Official United States District Court Reporter

16

17

18

19

20

21

22

23

24

25
```